WILLIAM G. BATES *et al.*

*v.*

JOHN D. GILLETT *et al.*

*Filed at Springfield March 31, 1890.*

1. WILLS—*rule of construction.* In the construction of a will it will be presumed that the testator intended to use the words employed in their ordinary meaning and signification, and no word or phrase should be disregarded, or rejected as meaningless, unless it is so far unintelligible or repugnant to other and controlling portions of the will that no effect can be given thereto.

2. SAME—*contingent remainder—in what it consists.* The general rule is, that a remainder is contingent if the persons who are to take are not *in esse,* or are not definitely ascertained. Among contingent remainders are those in which both the title and possession are postponed until the happening of some uncertain event, or when it is to vest upon an event certain in dubious or uncertain persons.

3. SAME—*vesting of remainder—at what time—whether before, or not until after, the ending of intermediate estate.* A testator devised his land to his three children, equally, for their lives, and then provided, that "after the death of either of them, their share to be equally divided amongst their children or their descendants, giving to the descendants of each child one share." He then devised to his son (one of the three children) one-third in fee, after which he stated his intention was, that his estate "be equally divided amongst all the children I may leave— the personal estate in fee simple, and the real estate, to the boys in fee simple, and to the girls for life, and the remainder to their children and descendants." After the death of the testator one of his daughters married, and one child was born of her which lived but a few hours. She afterward had three sons born, when she died: *Held,* that the remainder going to the children of this married daughter did not vest in interest until her death, and that her three sons then took the entire remainder in fee.

4. It is undoubtedly the rule, that when a testator speaks of the devise over taking effect "after" or "upon the death" of the life tenant, such words will ordinarily, if standing alone in the will, be construed as referring to the time when the estate will vest in possession, only; but it is always proper to consider them in connection with the context, to determine the intent of the testator in respect of when the estate shall vest in interest.

132 287 | 139 446
132 287 | 160 359 | 160 574
132 287 | 157 254
132 287 | 180 443
132 287 | 190 4 55
132 287 | 196 2 50
132 287 | 208 s516
132 287 | 212 353

5. A testator made a devise of his lands in equal shares to his son and two unmarried daughters,—to the son in fee and to the daughters for life,—and directed that after the death of either of them, "their share is to be equally divided among their children or descendants." By a subsequent clause he stated his intention was, that the girls should take their shares of the real estate for life, with remainder "to their children and descendants:" *Held,* that in respect to one of the daughters who had married, it was not until after her death that her share was to be divided among her children and descendants, and that the word "descendants" shut out all her heirs, except lineal heirs in the descending line, from participation in the remainder.

6. On a devise of a life estate to a daughter, with remainder to a class, as, to her children and descendants, the latter words are to be taken distributively, as designating the objects of the testator's bounty. In such case, the persons to take the remainder can not be known at the death of the testator or upon the birth of the issue of the daughter, but will depend upon the contingency of who, answering the description in the will, may be *in esse* at the period of distribution, and the remainder will not vest in interest until the death of the daughter.

7. SAME—*"descendants"—meaning of the word—in a devise.* Children are, *eo nomine,* descendants, but the latter are not necessarily children. A descendant is one who proceeds from the body of another, however remotely. The word is co-extensive with "issue," but does not embrace others not of issue. It does not embrace next of kin or heirs-at-law, for these phrases comprehend persons in the ascending line, and may also include collaterals. When the word "descendant" is used in a will, it means only lineal heirs in the direct descending line from the person named, unless there is a clear indication of intention on the part of the testator to enlarge its meaning. It is a good term of description in a will.

8. LACHES—*as a bar to equitable relief.* As a general rule, when the statute has fixed the period of limitation under which a claim in a court of law will be barred, courts of equity, by analogy, will adopt the limitation thus fixed, but they will often adopt a less period as a bar, on the ground of discouraging stale claims, or gross *laches,* or unexplained acquiescence in the assertion of an adverse right.

9. A party waited nearly twenty years after knowledge of the facts upon which he asserted a claim to an interest in land, before bringing suit for such supposed interest, and in his bill showed no excuse for his delay, and by his acts and conduct treated the land as belonging to the adverse claimant, and led others to believe his title was clear: *Held,* that the long acquiescence of the complainant in the adverse claim of title, and *laches* in bringing suit, was a bar to his bill.

10. NOTICE—*to purchaser of an interest in land.* A party, on learning that another was negotiating with his sons for the purchase of lands

which they derived through their grandfather's will, wrote a letter to the proposed purchaser, notifying him that the will under which his sons claimed title was invalid, and that he had acquired a certain designated interest in the lands by the laws of descent, basing his claim on the invalidity of the will, alone. On examination the will was found to be valid, and thereupon the purchase was made: *Held,* that the purchaser was not bound, on such notice, to examine any further than in respect to the validity of the will and matters appearing upon the records.

APPEAL from the Circuit Court of Logan county; the Hon. GEORGE W. HERDMAN, Judge, presiding.

This was a bill for partition, filed by William G. Bates, D. H. Harts and Robert Humphrey, in the Logan circuit court, April 12, 1887, against John D. Gillett and others.

The facts out of which this controversy arises, not sufficiently stated in the opinion of the court, are in substance as follows: In 1846, John Lorence, being possessed of a large estate in land, made and published his last will, under which both parties claim title. The material part of that will is as follows:

"Subject to the above devises, (in respect of rents and profits for a limited period) I devise one-third of my real estate, wherever situated, to my wife, Myrtilla Winn Furman Lorence, for her life, and the remainder thereof, together with the one-third devised to my wife, after her death, I devise to my three children, equally, to be divided between them, to have and to hold to them for their lives, and after the death of either of them, their share to be equally divided amongst their children or their descendants, giving to the descendants of each child one share. * * * I devise to my son, Walter Balfour Lorence, one-third part of all my real estate, in fee simple, to him and to his heirs,—it being my will and intention that my estate, subject to the devise aforesaid to my wife, be equally divided amongst all the children I may leave, the present (personal) estate in fee simple, and the real estate, to the boy in fee simple, and to the girls for life, remainder to their children and descendants."

19—132 ILL.

The testator's wife died in his lifetime. After his death the will was duly probated, and a division of land was made between the testator's three children in 1860, whereby Sophronia C. Lorence, his daughter, had set off to her the land now in controversy as her share of the estate,—that is, there was about eight hundred acres set off to the shares she represented at that time, and a like amount to the other children and devisees under said will. January 1, 1862, Sophronia married the complainant William G. Bates, and afterward had four children. It is claimed by complainants that the first of such children was born alive October 14, 1863, but lived less than twenty-four hours. It is through this child that complainants claim an interest in the lands of its mother. Said Sophronia died intestate January 20, 1867, leaving surviving, her husband, and three children living, namely, Walter L. Bates, Louis C. Bates and William C. L. Bates, who, claiming the entire estate under the will of John Lorence, some time before the filing of this bill sold the land to John D. Gillett for $20,000. Before the purchase by Gillett of the sons, William G. Bates wrote him the following letter:

"BAXTER SPRINGS, KANSAS, *Oct. 11, 1886.*
"JOHN D. GILLETT, ESQ.:

"*Dear Sir*—I am informed that my boys are trying to sell you their farm. I wish to inform you that I have, or think I have, a legal claim to a life interest to one-third of the farm, and am on the point of taking legal action to claim my right on these grounds: The will of John Lawrance, or, rather, Lorence, made a double, or, rather, a triple, devise of the land, which was contrary to the statutes of the State of Illinois at that time, and was therefore void; consequently, the land descended to the heirs under the statute laws of descent, and by the statute I became entitled to a life interest in one-third of all the lands belonging to my wife at the time of her death.

Yours respectfully,          WILLIAM G. BATES."

Gillett presented this letter to his attorney, who decided that the will was valid, and that Bates was neither entitled to curtesy nor dower in the land, and thereupon Gillett bought the land of the boys, and paid a portion of the purchase price before he had any notice that Bates claimed title through his said deceased son. Bates was appointed guardian of his three sons, who made the sale to Gillett, April 17, 1867. In his various accounts he charged himself with the rents of the land, and credited himself with taxes paid and all improvements placed by him upon the premises, etc. William G. Bates, on April 9, 1887, conveyed an undivided interest to the other complainants.

Messrs. HARTS & HUMPHREY, for the appellants:

Under the will of John Lorence, the remainder dependent upon the life estate of Sophronia C. Bates, *nee* Lorence, remained contingent until the birth of a child to her, when it became vested in such child, subject to be divested, *pro tanto,* by the birth of another child or children to her. *Cheney* v. *Teese,* 108 Ill. 473; *Voris* v. *Sloan,* 68 id. 588; *Scofield* v. *Olcott,* 120 id. 362; *Female Academy* v. *Sullivan,* 116 id. 375; *Railsback* v. *Lovejoy,* 116 id. 442; *Wardell* v. *Crandall,* 1 Com. 492; *Byrnes* v. *Stillwell,* 103 N. Y. 453; *Macomb* v. *Miller,* 9 Paige's Ch. 265; *Hannan* v. *Osborn,* 4 id. 336; *Doe* v. *Provost,* 4 Johns. 61; *Carney* v. *Jackson,* 4 Pet. 90; *Olney* v. *Hull,* 21 Pick. 311; *Annabel* v. *Patel,* 3 id. 360; *Doe* v. *Perrin,* 3 T. R. 484; *Right* v. *Creber,* 5 Barn. & Cress. 866; 2 Blackstone's Com. 169; 2 Jarman on Wills, 157, 177; 4 Kent's Com. 221, note; Fearne, 349-396; 2 Washburn on Real Prop. 237-240.

By the birth of the other three children, three-fourths was divested and vested in them,—in each one-fourth.

By the death of this first-born child intestate, having no children or brothers and sisters, its share vested in its father and mother. *Cheney* v. *Teese,* 108 Ill. 473; *Voris* v. *Sloan,* 68 id. 588.

By the death of the mother holding the life estate, intestate, complainant Bates became entitled to one-eighth in fee and one-eighth in curtesy.

The transaction between Bates and Gillett lacks every element of an estoppel. *Davidson* v. *Young*, 38 Ill. 148; *Powell* v. *Rogers*, 105 id. 318; *Chandler* v. *White*, 84 id. 435; *People* v. *Brown*, 67 id. 435; *Dorlarque* v. *Cress*, 71 id. 380; *Tillotson* v. *Mitchell*, 111 id. 518; *Holman* v. *Decker*, 110 Ind. 195.

Bates' possession as guardian was not adverse as to him as an individual, but was the possession of a tenant in common. *Hunter* v. *Dennis*, 112 Ill. 568; *Stevens* v. *Wait*, id. 544; *Ball* v. *Palmer*, 81 id. 370; *Busch* v. *Huston*, 75 id. 343; *Musham* v. *Musham*, 87 id. 80; *Todd* v. *Todd*, 117 id. 92.

Messrs. Blinn & Hoblitt, for the appellees:

The word "descendants" comprises issue of every degree, is a good description, and excludes collateral heirs. 2 Jarman on Wills, 98; *Hamline* v. *Osgood*, 1 Bradf. 409; *Crossly* v. *Clark*, 1 Amb. 396; *Haughton* v. *Kendall*, 7 Allen, 72; *Baker* v. *Baker*, 8 Gray, 101; *VanBuren* v. *Dash*, 30 N. Y. 417.

In this case the testator said, in substance, his daughter should take a life estate, and after her death—not before—it should be equally divided among her children and descendants. The remainder was not to be divided,—not to vest until her death, and then only her children and descendants were to receive it.

Bates, by acts and conduct in respect to the land, is estopped from disputing his sons' full ownership thereof. *Tiffany* v. *Henderson*, 55 Iowa, 405; *Buckstaff* v. *Dunbar*, 15 Neb. 114; *Hendershott* v. *Henry*, 63 Iowa, 744; *Anderson* v. *Armstead*, 69 Ill. 454; *White* v. *Ashton*, 51 N. Y. 287; *Higgins* v. *Ferguson*, 14 id. 269; *Donaldson* v. *Holmes*, 23 id. 85; *Schwartz* v. *Saunders*, 46 id. 18; Bigelow on Estoppel, 468.

The Statute of Limitations and the *laches* of appellant constitute a bar to this suit.

Mr. CHIEF JUSTICE-SHOPE delivered the opinion of the Court:

Complainants' claim is, that the son of William G. and So-phronia C. Bates, who died in infancy, took, under the will of his grandfather, John Lorence, a one-fourth interest in the lands devised for life to his mother, and after her death, to her children and descendants, and that, upon the death of said child without brothers or sisters at the time of his death, said interest descended to his father and mother, in equal shares; that, under the law, said William G. Bates had an estate by the curtesy initiate in the share descending to his wife, which became consummate upon her death in the year 1867—so that at the time of filing the bill in this case he was seized of one-eighth of the land set off to said Sophronia and her chil-dren, in fee, and a life estate in one-eighth thereof as tenant by the curtesy. If the estate vested in interest in the children of Sophronia C. Bates upon their birth, the contention of com-plainants, that said William G. Bates took an interest as heir-at-law of his deceased son, and as tenant by the curtesy in the estate in like manner descending to his wife, can not be dis-puted. If, however, the estate in remainder became vested in interest upon the termination of the life estate of said Sophro-nia, or at a period subsequent to the death of said infant son, he would take no interest in said land, and complainants' bill was improperly brought. The question for consideration is, therefore, when did the estate in remainder vest in interest. This must be determined from a consideration of the will of John Lorence, taking into view the whole will, and giving to each part of it, and to the phrases and words employed, their proper effect and meaning.

The testator first devises certain rents for a limited period, and then, subject to such devises, gives one-third of his real estate, wherever situated, to his widow, for life, who, having died during the lifetime of the testator, the devise to her need not be further considered. After the devise to the wife of one-

third of all his real estate for life, the will proceeds: "And· the remainder thereof, (all his real estate) together with the one-third devised to my wife, after her death, I devise to my three children, equally, to be divided between them, to have and to hold to them for their lives, and after the death of either of them, their share to be equally divided amongst their children, or their descendants, giving to the descendants of each child one share. * * * I devise to my son, Walter Balfour Lorence, one-third part of all my real estate, in fee simple, to him and to his heirs,—it being my will and intention that my estate, subject to the devise aforesaid to my wife, be equally divided amongst all the children I may leave, the personal estate in fee simple, and the real estate, to the boys in fee simple, and to the girls for life, and the remainder to their children and descendants."

Whatever seeming contradiction there may appear to be in the foregoing extract, will, upon close analysis, be found not to exist in respect of the devise to the daughters. The former provision gives to his three children, equally, for life, with remainder, after the death of either of them, "to their children or their descendants, giving to the descendants of each child one share;" while the later or explanatory clause provides that the real estate of the testator shall go "to the boys in fee simple, and to the girls for life, and the remainder to their children and descendants." It is clear that the estate devised to the daughters was a life estate, only. If the words, "to their children or their descendants," were to be regarded as controlling, and full effect given to the disjunctive "or," it might have the effect to create an alternative devise to the descendants of the daughter other than her children, and be held to import a condition which could not be determined until the period of distribution had arrived. (*Gittings* v. *McDermott*, 2 M. & K. 69; *Selby* v. *Whittaker*, 6 Ch. Div. (L. R.) 246; *Robb* v. *Belt*, 12 B. Mon. 643; Williams on Executors, 141; Redfield on Wills,

486, 487.) But we do not deem it important to determine whether such words indicate a clear intention on the part of the testator to substitute the issue of such of the children of the said Sophronia as might die during the continuation of the life estate, leaving issue, for such children of Sophronia so dying, or not, for a consideration of the later words employed by the testator, giving a life estate to his daughters, "and the remainder to their children and descendants," in connection with the context, will be found to produce the same result,—that is, to indicate a clear intention on the part of the testator to postpone the vesting of the remainder in interest until the termination of the intermediate estate.

At the time of making the will, and when the devise of the life estate took effect by the death of the testator, the daughter, Sophronia, was unmarried, and there was no person in existence to take the remainder under the will. According to the modern doctrine, there being no person *in esse* to take, the remainder vested, upon the death of the testator, in his heirs-at-law, subject to be divested when the will became operative as to such remainder. Primarily, the vesting of the remainder, under the will, depended upon the birth of children of the body of Sophronia. If she had died without issue, the estate would have descended, as intestate estate, to the heirs-at-law of the testator. (See 4 Kent's Com. 207; Tiedeman on Real Prop. sec. 297.) Subsequent to the death of the testator, his daughter, Sophronia, married the said William G. Bates, and there was born, issue of such marriage, a male child, who, it is shown, died within twenty-four hours of its birth, and, as we have seen, the interest of complainants rests solely upon the question of whether this child took a vested interest in the remainder, under the will of its grandfather, in the lands in controversy. It should be remarked here, that subsequently to the death of said child, three other children were born, issue of said marriage, and who survived their mother, Sophronia,

and in whom the estate, it is claimed, became vested, under said will, upon the death of their mother.

Among contingent remainders are those in which both the title and possession are postponed until the happening of some uncertain event, or where it is to vest upon an event certain, in dubious or uncertain persons. Ordinarily, when the remainder is limited to a class, some of whom are *in esse*, the remainder will be held to be vested, liable, however, to open and let in those born during the continuance of the particular estate and falling within the class. However, "the general rule is, that a remainder is contingent if the persons who are to take are not *in esse*, or are not definitely ascertained." (Tiedeman on Real Prop. sec. 402; 4 Kent's Com. 207.) No further discussion of the rule in respect of contingent remainders will be necessary. It is evident, that under this will the remainder could vest in possession only upon the termination of the life estate, and such would have been the effect if the testator had used no other language than was sufficient to create the life estate, with remainder over. We find, however, that the devise is to the daughters of the testator, for life, "and after the death of either of them," their share is to be equally divided among their children, etc. It seems clear that the testator had in his mind a division of his estate among the children and descendants of the life tenant, after her death. It can not be presumed that the testator used language without a purpose, or without intending thereby in some way to effect the disposition of his estate. It is *after* the death of Sophronia that her share is to be equally divided among her children and descendants. It is undoubtedly the rule, that where the testator speaks of the devise taking effect "after" or "upon the death" of the tenant of the particular estate, such words will, ordinarily, if standing alone in the will, be construed as referring to the time when the estate will vest in possession, only; but it is always proper to consider them in connection with the

context, to determine the intent of the testator in respect of when the estate shall vest in interest.

It is also to be observed, taking the construction of the will most favorable to complainants, that the division, whenever made or to be made, was to Sophronia's "children and descendants." Now, children are, *eo nomine*, descendants; but it by no means follows that descendants are necessarily children. A descendant is a person who is descended from another,— that is, one who proceeds from the body of another, however remotely. The word is the converse or opposite of ascendant. (Am. and Eng. Ency. of Law, tit. Descendant.) Descendants include every person descended from the stock referred to. It is co-extensive with issue, but does not embrace others not of issue. It is not to be understood as meaning next of kin, or heirs-at-law, for these phrases comprehend persons in the ascending as well as the descending line, and may also include collaterals; but it does mean the issue of the body of the person named, of every degree, such as children, grandchildren and great-grandchildren, and all others in the direct descending line. (*Hamlin* v. *Osborn*, 1 Bradf. 409.) And when the term "descendant" is used in a will, it means only lineal heirs,—those in the direct descending line from the person named,—unless there is a clear indication of intention on the part of the testator to enlarge its meaning. (*Barstow* v. *Goodwin*, 2 Bradf. 413; *Baker* v. *Baker*, 8 Gray, 101; *Walker* v. *Walker*, 25 Ga. 420.) And so it has been held that "descendants" is a good term of description in a will, and includes all who proceed from the body of the person named, to the remotest degree. (*Crossly* v. *Clark*, 1 Amb. 396. See *Jewel* v. *Jewel*, 28 Cal. 236.) And this is the ordinary meaning applied to the word "descendants," not only by the profession, but by the laity.

The testator, when providing for the distribution of his estate after the death of the first takers, directs its division among the children of the life tenant or their "descendants;"

and, when endeavoring to make his meaning clear by the subsequent clause, again directs that the remainder over shall go to "their children and descendants." We are endeavoring to determine what was in the mind of the testator, and his intention in respect of this share of his estate; and, as we have seen, it is not to be presumed that he used words in making disposition of his estate that he did not intend to have their ordinary and usual effect and signification. Nor are we at liberty to disregard or reject as meaningless any word he has employed, unless it is so far unintelligible, or repugnant to other and controlling portions of the will, that no effect can be given thereto. Thus construed, it is clear to us that the testator had in contemplation the possible distribution of his estate, when it should be made, to others than to children of his daughter. The testator must have contemplated the subsequent marriage of Sophronia, birth of issue of her body, and that such issue might have children and die before the estate became vested under the will. Any other construction would render the use of the word "descendants" unmeaning and useless. It would be absurd to suppose that the testator had intended or determined that the remainder should go to the children of Sophronia at their birth, in view of the language employed. If such had been his intention, the words "and to her children" would have expressed his intention definitely and accurately. If the estate vested in interest in the infant deceased child, as contended, there could, by no possibility, be descendants, other than the children of Sophronia, who could take. It follows, therefore, that who was to take, was, at the date of the will, indefinite and undetermined, for, as we have seen, if the testator intended that at some time the remainder was to go to Sophronia's children and descendants, it depended not only upon Sophronia's marriage and birth of issue, but he must have had in contemplation that such issue might itself have issue, and decease, before the period arrived when the estate would vest. This being so, it follows, necessarily, that

the estate in remainder was contingent, not only upon the birth of children to Sophronia, but upon their surviving the period when the estate was to vest in possession,—that is, until the termination of the life estate,—for until the happening of that event it could not be known who were to take. As we have seen, the devise was to a class,—*i. e.*, to his daughter's children and descendants,—and these words are necessarily construed as designating the objects of the testator's bounty. They would not take as representatives of the mother, Sophronia, but under the will, and as purchasers.

The conclusion can scarcely be resisted, that the thought of the testator was to place his daughter's share of his estate beyond the interference or control of her husband, in the event of her marriage, and make provision alone for her and her lineal heirs. The definite intention of the testator is manifested,—that, so far as this interest is concerned, it should not depart out of the direct descending line until it vested in interest. There was nothing in this in contravention of the statute against perpetuity, for, as we have seen, the estate would, at the farthest, vest in interest upon the termination of a single life then in being. The devise was, here, to a class,—to his daughter's children and descendants,—and these words were intended to be taken distributively, as designating the objects of the testator's bounty. The class of persons who were to take was not definitely ascertained at the time of the making of the will, or at the death of the testator, or upon the birth of issue of the body of Sophronia, but depended upon the contingency of who, answering the description in the will, might be *in esse* at the period of distribution. As we have seen, the general rule is, in such case, that the contingency can only be determined when the day of distribution arrives. (Authorities *supra; McCartney* v. *Osburn*, 118 Ill. 416; *Ridgeway* v. *Underwood*, 67 id. 419; *Blatchford* v. *Newberry*, 99 id. 11; Beach on Wills, 298; 1 Jarman on Wills, 839.) The persons *in esse* falling within the description would then take, not as repre-

sentatives of the mother, or by or through her, but under the will, and as purchasers.

We are of opinion that, giving effect to the provisions of this will, it clearly appears that the testator intended the remainder to vest in interest in such of the issue of the body of his daughter Sophronia, of whatever degree, that should be in being when the estate vested in possession; and that therefore, the vesting of the estate being postponed until the termination of the life estate created by the will, the infant son, under whom the complainants claim title, took no interest in these lands, and was therefore incapable of transmitting any interest therein to the complainant Bates.

But in any view that may be taken, the further question is presented by this record, whether the complainants are not barred of the equitable relief sought, by *laches* in asserting their claim. The first child was born October 14, 1862, and lived not over twenty-four hours, according to appellants' own evidence. January 22, 1867, the mother died, leaving these other three sons, who are yet living. April 17, 1867, the complainant Bates was, by the county court of Logan county, appointed guardian of these three sons. From that time until he removed to Kansas, in October, 1883, he lived upon the land in controversy. When he went to Kansas he rented the land, by written lease, as the guardian of the sons, the land being therein described as "all the land occupied by said Bates, and belonging to said heirs of Sophronia C. Bates, situated," etc. This lease was ratified and approved by his minor sons, and by the county court. In the various accounts he rendered to the county court he treated the land as his sons', and in none of them does he intimate that he had any interest in the property whatever. In 1867 he charges himself with $779.19 rent for the land, and credits himself $480.13 for taxes paid on the land, and for fruit trees, repairing fences, and for his personal attendance in making such expenditure. In 1868 he charges himself with rent, and damages received

for the laying out of a road over the land, etc., $1013.21, and credits himself with taxes, material and work put upon and furnished to the land, amounting to $779.97. In 1869 he charges himself with $1043.80, and credits himself with $1305.50 for lumber used in the construction of two houses, for nails, fruit trees, setting the same, repairing fences, etc. Similar reports were filed for each succeeding year, in which the guardian credited himself with the improvements put upon the land. During the entire period of his guardianship it does not seem that he ever made known that he had or claimed to have any interest in the land. He, by his conduct and acts, held out to the world these lands belonged to his three sons, and the evidence shows conclusively that they at all times regarded themselves as the owners.

The first claim of any interest in the land by the guardian, Bates, appears in his letter of October 11, 1886, after the termination of his guardianship, and when he learned that his sons were endeavoring to sell the land to Gillett. But in that letter his only claim is based on the invalidity of the will. He therein claims that the will was void, and that the property passed to his wife by descent, and he therefore had a life estate therein. Upon examination this claim proved to be unfounded. If his claim had been well founded, this letter would have been notice of it, but certainly was no notice of any other claim or ground of claim to an interest in the estate. If Bates had simply said he claimed an interest in the land, without stating the ground, the letter would have been sufficient to put the purchaser on inquiry, and he would have been held to have had notice of such rights as were apparent in Bates. But as Bates had already stated on what ground he claimed interest, Gillett was bound only to see that claim was invalid. If he had any legal rights not disclosed by the record, it was his duty to notify Gillett of them, truthfully. The record showed the title in his three sons, and his accounts as their guardian, and his entire dealings in respect of this land, so far as appears in

this record, show the same thing. It seems strange that if the first son was born alive, Bates should have been ignorant of his supposed rights for so many years. The living sons understood in the family that the first child was not born alive. The mother can not now testify. Nearly twenty-five years had elapsed between the birth of said child and before the filing of this bill, and it is manifestly difficult, if not impossible, at this late day to prove the fact, whatever it may be.

As a general rule, where the statute has fixed the period of limitation under which a claim in a court of law would be barred, courts of equity, by analogy, will adopt the limitation thus fixed. "A court of equity will, however, often treat a lapse of a less period than that provided in actions at law, as a presumptive bar, on the ground of discouraging stale claims, or gross *laches*, or unexplained acquiescence in the assertion of an adverse right." *Castner* v. *Walrod*, 83 Ill. 171; 2 Story's Eq. Jur. sec. 64 a, 1520; 2 Maddox' Ch. Pr. 244, 247; Mitford's Eq. Pl. 269-274.

In the first case cited in the preceding paragraph, this court say: "The principle that must control a case of this character has been clearly stated by Lord CAMDEN in *Smith* v. *Clay*, 3 Brown's Ch. 645, in these words: 'That a court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights for a great length of time. Nothing can call this court into activity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive, and does nothing. *Laches* and neglect are always discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court.' The principle announced in the case cited has been so long sanctioned and upheld, both in the courts of England and this country, and the doctrine that courts of equity will not lend their aid to enforce stale demands, so well understood and so well established, that the citation of authorities to sus-

tain the question would seem to be unnecessary." See *Beach* v. *Shaw,* 57 Ill. 17; *Carpenter* v. *Carpenter,* 70 id. 457.

In *Lequatte* v. *Drury,* 101 Ill. 77, it was held, that after the lapse of thirteen years the relief sought should be denied, on the ground of *laches.* In *Howe* v. *South Park Commissioners,* 119 Ill. 101, the court, after citing numerous decisions of other courts, says: "The principle that lies at the foundation of all the cases in this court on this subject is, the party who challenges the title of his adversary to real property, must be diligent in discovering that which will avoid the title or render it invalid, and diligent in his application for relief. Unreasonable delay, not explained by equitable circumstances, has always been declared evidence of acquiescence, and will bar relief."

Thus it is seen that the uniform current of decisions is, that courts of equity will not permit the assertion of stale claims, and especially is this so where there are equitable reasons why a short period of limitation should be adopted. There are here, in our judgment, strong equitable considerations which should bar the relief sought by this bill. As we have seen, within a few months of twenty years elapsed between the time when the right of the complainant Bates to assert his title first arose, and the filing of this bill. He abstained from asserting (and, so far as this record shows, from claiming,) any interest in this land until long after he had ceased to be the guardian of his sons, and presumably until after the guardianship matters had been settled and adjusted. It must be evident that to permit him now to assert title to one-eighth of this land in fee, and a life estate in another one-eighth, would be entirely contradictory to the basis upon which he adjusted his accounts as guardian. During all this time the children had understood that they were the owners in fee, deriving their title under the will mentioned, and not until after they have contracted to convey a good title, and become liable thereon, does he assert, or, so far as shown, claim, the interest he alleges in his

bill.  It may be that Gillett, as to a portion of the purchase price, (it not having been paid until after notice of this claim,) does not stand in the position of an innocent purchaser for value.  But it would, we think, be grossly inequitable to now permit assertion of title by the complainant Bates.  At least he does not come into equity with conscience, good faith and reasonable diligence.  His delay is wholly unexplained, and it must be held that his acquiescence for the length of time indicated, amounts, in equity, to a complete bar to the relief sought by complainants' bill.

The decree of the circuit court is affirmed.

*Decree affirmed.*