CHRISTENSEN, Respondent, vs. MANN, Appellant, and SKLUTE and another, Respondents.

*May 13—October 20, 1925.*

*Adjoining owners: Right to lateral support: Land in natural condition: Duty of excavator: To use reasonable care: To give notice: Evidence: Judicial notice: Construction of buildings in cities: Underpinning as safe method: Sufficiency of evidence: Party-walls: Right of lateral support to owner: Railroad rights of way: Abandonment of wall by one owner.*

1. Where soil is in its natural condition, with no structures thereon in close proximity to the dividing line of adjoining owners, each owner is entitled to the lateral support of his soil. p. 575.
2. The right of lateral support does not extend to a structure built upon or near a dividing line.   p. 576.
3. As respects a building erected near a dividing line, the adjoining owner, in making excavation, must exercise ordinary care and not employ violent, antiquated, or disapproved methods, and is required to use his own property in a careful, prudent manner so as not unnecessarily to endanger or damage such building.   p. 576.

4. The degree of care to be exercised by an adjoining landowner in making an excavation, as regards a building erected by a neighbor near the dividing line, must be commensurate with the apparent or actual danger, and depends largely on the peculiar facts and circumstances and the physical condition existing in each case.  p. 577.

5. When an excavator has met the requirements applicable to a particular case, he is immune from a claim for damages by the owner of an adjoining building, who is required to maintain proper protection for his own building, if he gives the adjoining owner reasonable and timely notice so that the latter may use means to protect his own structure.  p. 577.

6. It is a matter of common knowledge, of which a court will take judicial notice, that in congested business districts in larger cities one erecting a building must take cognizance not only of present conditions but of those which may occur through growth and progress in the future, and that buildings are therefore constructed so as to permit additions both upwards and downwards.  pp. 581, 582.

7. The evidence in this case is *held* to sustain a finding that an owner excavating soil and erecting a building adjoining the building of another properly used the underpinning method for the purpose of affording lateral support, as the safest and least expensive, as against the contention that the sheathing or needling method would have been better.  p. 588.

8. Where one builds several houses connected by a common partition wall and the houses are sold to separate owners, the purchasers are entitled to the right of lateral support not only of the soil but also of the building.  p. 593.

9. Where the owner of land with a building thereon sells that part of the land on which the building stands, retaining ownership of the premises extending to the building, or where either party subsequently sells his interest, the right of lateral support, both of the land and the building, arises by implication from necessity.  p. 593.

10. A right of lateral support exists for the protection of a railroad right of way, where land is condemned for that purpose, and in the condemnation the right of lateral support is included and appropriated.  p. 592.

11. The act of owners of a building adjoining a party-wall in tearing down the building and constructing their own wall did not amount to an abandonment of the wall or the release of any party-wall rights to which the owner of the adjoining building was entitled.  p. 596.

12. It is not necessary that a party-wall stand on the property of both adjoining owners, but it may stand partly on the one and partly on the other, or it may stand wholly on the property of one and nevertheless be a party-wall.  p. 596.

13. Notwithstanding one of the adjoining owners, in tearing down his building, abandoned a party-wall and erected a wall of his own, where such act was not consented or agreed to by the other owner it did not release rights that the latter had to the lateral support of the party-wall.  p. 596.

APPEAL from a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge.  *Reversed.*

The appeal is from a judgment in favor of the plaintiff and against the defendant *Mann* for the sum of $2,794.70, damages and costs.

Block 18 of the original plat of the city of Racine is bounded on the north by Fourth street, on the south by Fifth street, on the east by Lake avenue, and on the west by Main street.  Beginning on the northeast corner of the block the lots facing on Lake avenue are numbered consecutively from 1 to 7, each lot being 60 feet in width and 120 feet in depth.  Beginning on the southwest corner of said block, the lots facing on Main street are numbered consecutively from 8 to 14, such lots being of the same width and depth as those fronting on Lake avenue.

In order to avoid unnecessary repetition we will set out the findings of fact of the court, which include many of the undisputed facts, and which present in the main the issues raised herein:

### *"Findings of fact.*

"First. That the defendant, *Harry E. Mann,* since August 30, 1912, has been and now is the owner in fee of the west 110 feet in length of the south half of lot 11 in block 18, original plat of Racine, subject to a right of way twelve feet in height over the north nine feet in width of the south ten feet in width thereof, used as a lobby or entrance from

Main street to the Bijou theater, situate east of said premises.

"Second. That the defendants *Simon Sklute* and *David S. Komiss* since December 23, 1919, have been and now are the owners of real estate adjoining the Mann property on the south, described as lots 5 and 10 and the north ten feet in width of lot 9, and the north ten feet in width of the west fifty feet in width of lot 6, all in said block 18.

"Third. That the plaintiff is a building contractor and was employed by the defendants *Sklute* and *Komiss* to construct a building known as the Arcade building on their premises above described.

"Fourth. That prior to March 11, 1922, there stood upon a portion of the premises of the defendants *Sklute* and *Komiss* an old brick building known as the Merchants Hotel, built previous to the year 1860; and that said defendants *Klute* and *Komiss* had prepared plans and specifications for the erection on the site of said Merchants Hotel of a modern office and store building to be known as the Arcade building, and to be 240 feet in length, extending from Main street to Lake avenue and covering their entire premises above described, the north wall of which, for a distance of 110 feet, was to be so constructed as to adjoin and be immediately contiguous to the south wall of the building of the defendant *Mann.*

"Fifth. That in the construction of the Arcade building it became necessary to excavate to a depth from ten to twelve feet below the lowest point of the foundation wall of the building of the defendant *Mann* along the entire line dividing the two properties; that prior to beginning such excavation, and on March 11, 1922, they notified the defendant *Mann* what they proposed to do and the depth of the proposed excavation, and that he should provide proper support and protection for his building and its walls. That as the defendant *Mann* neglected to take any steps for the protection of his building and walls, a second notice of substantially similar import was served upon him on June 15, 1922, which also was ignored.

"Sixth. That it became dangerous to proceed further with such excavation without adequately supporting the building of the defendant *Mann,* and that on or about June 26, 1922, a written agreement was entered into between the

plaintiff and defendants, a copy of which is attached to the answer of the defendant *Mann* and a purported abstract of which is set out in the findings.

"Seventh. That the plaintiff, with the approval and consent of C. O. Johnson, protected and supported the building of the defendant *Mann* by underpinning the foundation wall with brick piers, using shoring timbers for temporary support during the progress of the work.

"Eighth. That the foundation wall of the Mann building was built of field stone and had disintegrated to some extent and was in bad condition; that the theater entrance through the Mann building was in constant daily use by large numbers of people attending the theater in the rear; that the underpinning method adopted by the plaintiff and approved by Johnson was the generally approved and safest method of doing the work; that the so-called sheathing method, in view of the uses to which the adjoining buildings were put and the depth of the excavation, was inadequate and unsafe, and had such method been used it would have been necessary also to needle the Mann building, or otherwise support it, at an expense as great or greater than the expense of underpinning.

"Ninth. That it would not have been practical to support the Mann building during the construction of the new building by building the Arcade wall and foundation in small sections, and that such method would have been inadequate and dangerous unless combined with and supplemented by the needling method or some other method of support; and that building the wall in small sections would have been more expensive than the underpinning method actually used.

"Tenth. That the defendant *Mann* did not direct the plaintiff to use any other method than underpinning, nor undertake the responsibility and consequences of using any other method, or himself undertake or offer to support his building by any method whatsoever, nor did he at any time prior to the signing of said contract with the plaintiff extend to the plaintiff or to the defendants *Sklute* and *Komiss* the privilege of entering upon his property for the purpose of supporting his said building.

"Eleventh. That no support was necessary for the soil in its natural condition, but that support was necessary because of the pressure or weight of the building upon the soil.

"Twelfth. That prior to the destruction of the Merchants Hotel building in April, 1922, the east 39½ feet only of the Mann wall was a party-wall and used as such by *Mann* and the owners of the Merchants Hotel, but that said wall was situate wholly upon the Mann property and was abandoned by the defendants *Sklute* and *Komiss* and ceased to be a party-wall or used as such upon the wrecking of the hotel building.

"Thirteenth. That plaintiff furnished all the work, labor, and material in underpinning the building of the defendant *Mann*, and that the work was completed on July 18, 1922, and approved and accepted by all of the defendants.

"Fourteenth. That the contract price of the work included ten per cent. over and above the cost thereof, and amounts to $2,461, which sum became due and payable on July 18, 1922, and no part of which has been paid."

The following are the conclusions of law:

"First. That the duty of supporting the building of the defendant *Mann* was upon him and not upon the plaintiff or the defendants *Sklute* and *Komiss* after the service of notice by the latter.

"Second. That the defendants *Sklute* and *Komiss* were not required to build the Arcade wall in sections in order to support the building of the defendant *Mann*, nor to undertake the responsibility and risk of using any other substitute method, but such duty was upon the defendant *Mann* himself.

"Third. That the plaintiff is entitled to judgment for the sum of $2,461, with interest from July 18, 1922, and for costs."

The soil of the lots on which the Arcade building was constructed consisted of hard clay, of a very solid and durable variety. The contract for doing the excavating upon lots 5 and 10 was sublet to one Socha, who had practically completed the entire excavation prior to June 26, 1922, excepting only that there was left to the south of the dividing line between lots 10 and 11 a bank of earth for the purpose of affording temporary protection to the south wall

of the building belonging to the defendant *Mann*.   Up to that time *Mann* had taken no steps whatever to protect the south wall of his building, and it became apparent to all of the parties that if the excavation proceeded up to the line of the two adjoining properties without resorting to some means whereby the walls of the Mann building would be amply supported, great danger would be encountered by the possibility of the wall giving way and caving in onto the property of the defendants *Sklute* and *Komiss,* thereby resulting in great damage to both adjoining owners. *Mann* took the position that the duty of protecting his south wall rested upon the defendants *Sklute* and *Komiss,* while the latter contended that, inasmuch as they had given the two notices referred to in the findings of fact herein set forth, the obligation to support such Mann wall rested upon *Mann* himself.   At this stage the parties hereto had a conference, which resulted in the execution of the contract of date of June 26, 1922, a copy of which was appended to the answer of the defendant *Mann,* and referred to in the findings.   This contract is a three-party contract, in which *Mann* was designated as the party of the first part, *Sklute* and *Komiss* as parties of the second part, and the plaintiff, the general contractor of the building herein referred to as the Arcade building, as the party of the third part.   In the contract, after reciting the ownership and describing the respective pieces of property, the depth of the wall of the Arcade building beneath the foundation of the Mann building, and the controversy which had arisen between the owners of the respective properties as aforesaid, authority was granted to the party of the third part to enter upon the premises of the parties of the first and second part to support and protect the building and walls of said first party, all necessary work in that behalf to be done in accordance with plans and methods to be adopted and approved jointly by the third party and one C. O. Johnson of Racine, a

building contractor. The agreement then provides that, in any action between the parties, the question of liability for the payment of the expense of said support and protection, or a proper apportionment thereof, shall be heard and determined in a proper action brought for that purpose, without prejudice to the rights of either said first or second parties by reason of the agreement or any acts done thereunder; that the necessary material and labor shall be furnished by the party of the third part, at the actual cost thereof, plus the contractor's profit of ten per cent., and that the work shall be done in a careful and workmanlike manner and in accordance with approved methods, and that the party of the third part shall keep an accurate account of such cost of labor and material.

The building known as the Arcade building was constructed of reinforced concrete and is of the cantilever type. To support this building a number of reinforced concrete columns were constructed, which were supported upon concrete footings extending to a depth of five feet below the basement. These columns were 2 x 2 feet in size, and from sixteen to eighteen feet apart, and were connected up by a certain wall one foot in thickness, also built of reinforced concrete. The Mann property was one hundred and ten feet in length, and upon it stood a three-story brick building ninety feet in length. The north nine feet of the south ten feet of the Mann property was reserved to a height of twelve feet for the purpose of a passageway, which at an early date was used as a means for an entrance from Main street to a livery stable located in the rear and to the east of lot 11. At the time of the construction of the Arcade building there had been built upon lot 4 a moving picture theater, owned by the Badger Improvement Company, and this nine-foot passageway or entrance was used as a lobby and entranceway for patrons of the theater. The underpinning consisted of ten-foot brick piers about six feet apart. The

evidence shows that this method was agreed upon by the engineers of the Arcade building, and approved by Mr. Johnson, and it was also decided that a continuous wall was not necessary.

Further facts will be referred to in the opinion.

For the appellant there were briefs by *Simmons, Walker & Wratten* of Racine, and oral argument by *John B. Simmons*.

For the respondent *Christensen* there was a brief by *Thompson, Myers & Helm* of Racine, and oral argument by *W. D. Thompson*.

For the respondents *Klute* and *Komiss* there was a brief by *Hand & Quinn* of Racine, and oral argument by *E. B. Hand*.

The following opinion was filed June 22, 1925:

DOERFLER, J.   As is evident from the agreement of June 26th, it is claimed by the defendant *Mann* that he is not liable for the cost of underpinning; that generally, under the law of lateral support, this expense and this obligation, under the facts in this case, must be borne by the owners of the Arcade; that inasmuch as the Arcade owners and their contractors constructed their north wall by a process of continuous pouring, so as to make the building practically monolithic, instead of building this wall in small sections, that therefore they used an improper method, as the result of which the defendant *Mann* was relieved from any obligation to pay for the method pursued, namely, that of underpinning; and that the nature of the soil was such as to make it feasible and safe to pursue another and less expensive method.   Where the soil is in its natural condition, there being no structures built thereon in close proximity to the dividing line of the adjoining owners, each owner is entitled to the lateral support of his soil, and such right to such support is absolute.   The doctrine of the right of lat-

eral support has been recognized by courts and law writers for centuries, and is firmly intrenched in the jurisprudence of this country and of England. It is a right which does not rest in a grant, but arises under the law of nature. But while the land of an adjoining owner is burdened with an easement to protect his neighbor's soil while in its natural condition, the right of lateral support does not extend to a building built upon or near the dividing line. The rule is well stated in 1 Ruling Case Law, 381, as follows:

"The principle established by the authorities is, that one landowner cannot, by altering the natural condition of his land, deprive the adjoining proprietor of the privilege of using his own land as he might have done before; and consequently, that he cannot, by building a house near the margin of his land, prevent his neighbor from excavating his own soil, although it may endanger the house." See numerous authorities cited in note 19.

If this were not so, an owner by building upon the dividing line or in close proximity thereto could limit his neighbor in his right to use his land for a legitimate purpose in accordance with his own wishes. The owner of a structure so built has certain well defined rights which are universally conceded by the authorities. In the first place, in proceeding with the excavation ordinary care must be exercised. The excavator cannot proceed with violent methods that will unnecessarily endanger his neighbor's building. He cannot negligently trench upon his neighbor's soil so as to remove or weaken the protection to the building, nor can he use antiquated or disapproved methods in doing the work. He is required to make such use of his own property in a careful and prudent manner as will not unnecessarily endanger or damage the building of his neighbor.

It may also be said that the degree of care to be exercised must be commensurate with the apparent or actual danger. Where the soil required to be excavated is of a hard sub-

stance, containing great adhesive qualities, less care need be taken than where the soil is sandy or gravelly and of a nature that can withstand but little disturbance. So that the general proposition may be laid down that the degree of care required in each particular case depends largely upon the peculiar facts and circumstances and the physical condition existing in each case. When, however, the requirements applicable to a particular case have been properly met by the excavator, then he is immune from a claim for damages by the owner of an adjoining building, who under such circumstances is required to afford and maintain proper protection for his own building. The law is aptly stated in 1 Corp. Jur. 1216:

"An owner of land adjoining land upon which there are buildings or other structures may lawfully excavate on his own land and to the line, although he endangers such structures and erections, and, in the absence of negligence or statutory provisions on the subject or of a contractual or prescriptive right of lateral support, he will not be liable for the injury sustained by the adjoining owner, as to the buildings or structures; or, in other words, he will be liable for no greater loss than would have resulted had there been no building on the land, provided the excavation was not made with an improper motive; and he will not be liable for injuries, either to the land or to the buildings thereon, occasioned by the subsidence of the land into an excavation on adjoining land, where such subsidence was caused by the pressure of the buildings."

In order that the owner of property who excavates his soil in close proximity to his neighbor's building may be immune from a claim for damages, the law also imposes upon him the duty of giving reasonable and timely notice to his neighbor, so that the latter may use such means as he may deem proper to protect his own structures, and a failure to give such notice, in the absence of knowledge on the part of the neighbor, would be negligence. The views

so expressed are incorporated in the common law of this state in the decision in the case of *Hickman v. Wellauer,* 169 Wis. 18, 171 N. W. 635, where it is said:

"As incident to plaintiff's ownership of his lot he had the absolute right, so far as his land was in its natural condition, to lateral support from defendant Wellauer's lot.   So far as plaintiff had added to the weight of the soil by the erection of his building, for such additional load plaintiff himself must provide ·by proper support and care whenever defendant wished to exercise his right to excavate on his land.    In the absence of actual knowledge by plaintiff of defendant's intended excavation so near plaintiff's building that danger thereto might reasonably be anticipated, it was incumbent on defendant to give reasonable notice of such intention, that plaintiff might have an opportunity to protect and support his building."

Numerous authorities both in this state and other jurisdictions are cited to these propositions in the *Wellauer Case.* In the case quoted from, the defendant proceeded to excavate to a considerable depth beneath the foundations of the plaintiff's building without giving the plaintiff any notice whatsoever of his intentions.   He selected his own method of supporting plaintiff's wall.   The claim was made by the plaintiff that the defendant not only selected an unsafe and dangerous method but that he did not prosecute the work with ordinary care, and that the underpinning pillars were too far apart, so that the plaintiff's building listed, resulting in considerable damage.   It is further said in that opinion, upon the facts disclosed in that case, that there was "created such a relationship between the two that there arose an obligation on defendants' part that the work should be prosecuted by reasonable and proper methods and with reasonable skill and care.   A breach on their part of such obligation made them liable for consequent damages."

That the underpinning method resorted to in the instant case was a proper method is clearly established by the fact

that no consequent damage whatsoever resulted to the Mann property on account of the method selected and pursued. A general scheme of underpinning was carefully considered by the plaintiff, a man of great experience in the erection and construction of large buildings, by his engineers, his architect, and by other experts, and was to all intents and purposes acquiesced in and approved by Johnson, who is named in the contract, and who was one of the principal witnesses for the defendant *Mann* in the trial of the action.

As already stated, the degree of care required in the work of protecting a building under the circumstances herein existing must be commensurate to the actual or apparent danger confronting the parties. Adjoining the Arcade building was a wall extending back to the Bijou theater, and adjoining this wall to the north was the entrance which afforded a passageway for patrons to the theater, which was open daily for performances to which the public was invited. This added an additional hazard, which required careful consideration and recognition on the part of those who had undertaken the support of the Mann building. There was, therefore, involved not only the protection of property but the protection of human life. Under such circumstances, the safest and best method should be resorted to. Here also it must be borne in mind that, notwithstanding the giving of two timely notices to *Mann,* no effort was made on his part to protect his own building or the lives of those who were endangered by the excavations involved in the building of the Arcade. It clearly appears that the defendant *Mann* attempted to relieve himself of all responsibility and to shift the same upon the owners of the Arcade and their contractors. While this responsibility was assumed, under the agreement, by the Arcade owners and their contractors, it must also be conceded that they exercised the highest degree of care and caution required under the circumstances in order to live up to their obligations. No method which may

be designed by even the greatest expert is so perfect but that it may result in criticism and in a charge of negligence, and had actual damage to any of the buildings resulted from the method employed, it is not unlikely that a suit for damages might have resulted.

In the *Wellauer Case* the precise method used here was resorted to, and it was there contended that the method was an improper one; that the sheathing method or the needling method would have been safer; and that the damage resulted in part from the pursuit of an improper method. True, it was also alleged and found in that case that the underpinning pillars were placed at too great a distance apart, so as to weaken the support of the Hickman building. The vital difference, however, between that case and the instant case lies in the fact that damages actually ensued in the *Wellauer Case,* while no damage ensued in the instant case. Furthermore, while one method may be the proper and even the only safe method in one case, it may be entirely improper and unsafe in another case.

The walls of the Arcade building were so constructed that the entire wall could be poured at the same time, thus forming a continuous, solid, and firm concrete structure. Counsel for the defendant *Mann* contend that these walls could, with little additional expense, have been built in small sections; that during the building of such sections the Mann wall could have been supported by shoring timbers, and that therefore the underpinning method constituted a rather extravagant procedure and was entirely unnecessary and uncalled for. Building in this manner, however, would not have afforded the strength to the Arcade building that the method employed furnished. The Arcade building is a four-story structure, so built as to permit additional stories to be added in the future if thought desirable. It stands to reason that a building constructed in sections is not as substantial or as durable as one which results from

the pouring of the entire wall at the same time. It was the privilege of the owners of the Arcade building to erect such a structure upon their own premises as would meet with their individual designs. This is a right which is accorded under nearly all the authorities, and in view of the obliga- tion of the owner of a building built in close proximity to the line of his neighbor to protect his own building upon receiving proper notice, it would hardly be logical to hold that the owner of the adjoining property must build his building so as to relieve his neighbor of the duty imposed upon him by law.

For many years past the larger cities in this country have added immensely to their population. The trend of popu- lation has been from the rural communities to the cities, which has resulted in large and extensive congested areas, greatly enhancing such areas in value. As values have un- precedentedly soared, and as taxes have increased by reason of such increased values, it followed that the owners of business properties in cities found it necessary to avail them- selves of the greatest possible use which can be made of their respective properties. As property rights extend up- wards from the surface to an unlimited extent, they also extend downwards into the soil, and the right of an owner to use his property both upwards and downwards may be modified or restrained only by the law-making power in the exercise of the police power, or by the exercise of the power of eminent domain. Therefore, in large congested business districts in larger cities, structures have been erected to a height unknown to the early history of the cities, and basements have been built beneath the surface far exceeding in depth the one constructed under the Arcade building. In building a business structure in the congested area in a large city the owner must take cognizance not only of present conditions but of those which may come about in the course of growth and progress in the future. Therefore

buildings are constructed with such foundations and walls and upon a plan which will permit additions both upwards and downwards. That these conditions in fact exist is a matter of common knowledge, of which the court can well take judicial notice. That a large building built of reinforced concrete (which appears to be the modern method of construction) will not be as substantial, durable, or serviceable when built in sections as one which is built in accordance with a monolithic type, stands to reason. That such a building, designed to house numerous stores and offices where the public attend in large numbers, should be of the most approved and durable type, no one can successfully dispute. The numerous joints made necessary where a structure is built in sections have a tendency to weaken the structure, and the building itself is more prone to settle at the joints.

The court found, upon ample evidence, that "it would not have been practical to support the Mann building during the construction of a new building by building the Arcade wall and foundation in small sections, and that such method would have been inadequate and dangerous unless combined with and supplemented by the needling method or some other method of support, and that building the wall in small sections would have been more expensive than the underpinning method actually used."

The case of *Eads v. Gains,* 58 Mo. App. 586, is one of the leading cases in the books, and is frequently cited in the authorities on the subject of lateral support, and the law applicable to the instant case is there enunciated in clear and forceful style. The following extract taken from the *Gains Case* meets with our approval, and we quote it as expressive of the law upon the subject, not only in this state but by the great weight of authority in other jurisdictions:

"When a building is erected upon the boundary of an owner's land, the servitude of lateral support is appropriated, to which the house-owner has no legal right in the absence

of a grant or other method of acquisition. As a corollary to this proposition, the adjacent owner is entitled to withdraw the lateral support to such structure afforded by his land; since it cannot be held that he is deprived of the full enjoyment of his property by the unauthorized imposition of a servitude thereon.

"If, in exercising such right (because of the householder's failure to perform his duty of protecting his building), he suffers the additional loss and expense of giving it artificial lateral support in order to excavate with ordinary care, it must result that he is damaged to the extent of this outlay in the enjoyment of his property rights, and that the damage is caused by the breach of duty of the householder in not protecting his building, when notified.

"Any other hypothesis would in effect lead to the absurd conclusion that the erection of the building carries with it the incidental right to subject the adjoining proprietor to its lateral support. For, if the householder, notwithstanding that he has no right to the support of his building from the soil of another, may prevent the full use of that soil by the other without undergoing a loss and expense for lateral support of said building, it is obvious that the rule denying any liability for lateral support is substantially subverted. The law preserves the substance of the rights of the parties and will not permit an advantage to be indirectly gained which could not be directly claimed."

Counsel for defendant *Mann* place great reliance upon the decision in the case of *Walker v. Strosnider,* 67 W. Va. 39, 67 S. E. 1087. The substance of that decision is summed up in the syllabus, which reads as follows:

"One who excavates on his own land must exercise reasonable care, prudence, and skill for the safety of buildings on adjacent land. This duty arises not from any right of support, *ex jure naturæ,* that the owner of the building has in the land of the excavator, but from a legal rule of conduct, requiring every owner of property to use it in such a manner as not to injure his neighbor's.

"The owner must not only abstain from collateral negligence or wrongful acts, such as unnecessarily heavy blasting, digging out of adjacent walls, projecting heavy articles

against the wall or building, and the like, but must perform the work with reasonable precautions for the safety of the adjacent buildings, such as diligence in the construction of his wall after having removed the soil, removal of the soil and replacement thereof with the wall by sections, if necessary, as a measure of reasonable precaution, or the adoption of other reasonable and practicable methods.

"In such case the excavator's duty goes beyond the exercise of care in making the excavation, such excavation being a mere incident of the alteration intended, and extends to the adoption of reasonable means of temporarily supporting the adjacent building while the work of erecting the new structure is in progress."

In so far as the *Strosnider Case* holds that the excavator's duty extends to the adoption of reasonable means of temporarily supporting an adjacent building while the work of erecting the new structure is in progress, it is clearly out of harmony with the decisions of this court and the great weight of authority, as evidenced both by the decisions in the various courts and by the text-book writers. It may also be true (which, however, we do not decide) that the person constructing a new building may be required in some instances to build his foundation walls in sections. This would appear to us to depend largely, if not entirely, upon the size of and the material used in construction and the type and nature of the building. Where the new building is not a large or heavy structure and is built of brick, stone, or concrete blocks, the building in sections may not materially affect the usefulness or the strength of the structure.

We have examined the other cases cited in the brief of counsel for the defendant *Mann* and have detected nothing which could in any manner persuade us from the conclusions we have arrived at as indicated in the foregoing. The law as laid down in the *Wellauer Case* and in other Wisconsin cases is so firmly established in the jurisprudence of this state that it must be deemed a rule of property, and if any relief or change is sought it must be obtained from the legislature.

So that from the situation in so far as it is heretofore reviewed in this opinion, we conclude that the defendant *Mann* could not appropriate to himself the right of lateral support of his building; and that after the giving of proper notice by the owners of the Arcade, and the exercise of reasonable care in the excavation by the latter and their contractors, they had performed their full duty, which would have immunized them from any claim for consequent damages resulting to the Mann property.

Counsel for the defendant *Mann* further argue that inasmuch as the soil on both the Arcade and the Mann property consisted of hard clay, of such an adhesive type as in durability and firmness to approach that of shale, the underpinning plan adopted was an extravagant and needless one, which would subject the defendant *Mann* to an unnecessary and large expense; and that the underpinning method was resorted to so as to enable the owners of the Arcade to construct a monolithic building resting solely upon its own foundations, without being designed to resist any lateral pressure of the south wall of the Mann building.

The fourth paragraph of the agreement of June 26th provides that: "The third party agrees to perform the work and provide the labor and material required for the support and protection of the building on the premises first hereinbefore described as he and the said C. O. Johnson shall determine to be necessary or expedient, . . . and to do said work in a careful and workmanlike manner, and according to approved methods for such work. . . ."

The sixth paragraph of the agreement, among other things, provides in substance that the agreement is entered into to enable the owners of the Arcade to expeditiously construct their building without determining the question of liability in advance of the construction, and then proceeds as follows: "It being expressly understood that said first and second parties, as between themselves, shall in no manner be prejudiced, nor shall any of their rights be affected or waived in such action to determine said liability, by this

agreement or any act or thing done or permitted there-under."

We have read this agreement carefully and given it considerable thought and study, and, as we construe it, it provides first that the support and protection to be furnished shall be such as the plaintiff and Johnson shall determine to be necessary or expedient, and that when the method shall be agreed upon the work shall be done in a careful and workmanlike manner and according to approved methods, leaving open thereafter only the question of liability for the work done and material furnished. The determination of the question of liability would depend, under the peculiar facts and circumstances of the case as thus far detailed, upon whom the obligation in law would have rested had the agreement not been entered into. Johnson, as it appears to us from the testimony, was appointed by the parties as one of the arbiters, and his appointment was suggested by the defendant *Mann*. Upon the plaintiff and upon Johnson, by the terms of the agreement, there rested the important and responsible duty of adopting a method of support that would protect not only the property of the parties from damage but would also protect the lives of the patrons of the theater. There is no satisfactory evidence in the case which would indicate that either *Mann* or any of his representatives had questioned the propriety of employing the underpinning method. *Mann* suggested no other method, either from the standpoint of safety or expense, and to all intents and purposes acquiesced in the one adopted. No criticism or opposition to the underpinning method was suggested or insisted upon by Johnson. Under these circumstances it would appear to us that the only question really before this court involves the one of liability based upon the law. However, inasmuch as the various methods available have been thoroughly argued in the briefs of the respective counsel, we will briefly consider them.

The court in its eighth finding of fact, based upon ample evidence, found:

"That the foundation wall of the Mann building was built of field stone and had disintegrated to some extent and was in bad condition; that the theater entrance through the Mann building was in constant daily use by the large numbers of people· attending the theater in the rear; that the underpinning method adopted by the plaintiff and approved by Johnson was the generally approved and safest method of doing the work; that the so-called sheathing method, in view of the uses to which the adjoining buildings were put and the depth of the excavation, was inadequate and unsafe, and had such method been used it would have been necessary also to needle the Mann building or otherwise support it at an expense as great or greater than the expense of underpinning."

There is credible expert evidence that the sheathing method is seldom used where a building like that of the Arcade is constructed; that such method would be unsafe; that the sheathing method is used where there is a simple bank to be kept in place where deep excavations are made for sewers or water pipe. There is also ample evidence that the use of the sheathing method would entail as large or even a greater expense than that of underpinning. Under this state of the evidence, and especially in view of the condition of the basement wall of the Mann building as detailed in the finding of fact above referred to, and of the great hazard of damage to property and the destruction of human life, the use of what was considered and proven to be the safest method in no sense can be deemed extravagant.

With respect to the needling method it may be said that the same might possibly have been employed successfully. However, the preponderance of the evidence of the experts leans decidedly in favor of the underpinning method. The needling method is described in detail in the *Wellauer Case, supra,* to which reference is hereby made. This method,

however, would have merely resulted in a temporary benefit to *Mann*, and would not have furnished him with a supporting wall formed by · the underpinning pillars, which, would be of great service in the future to the owner of the Mann property.    There was also considerable credible evidence that the needling method would have involved an expense as great or greater than that of the underpinning method.    Therefore, in view of the permanent service which the underpinning piers would avail *Mr. Mann* in the future, and of the preponderating evidence in favor of the under-- pinning method, we hold that those who had charge of the selection and execution of the proper method are not subject to any criticism for the course pursued by them.    Experience proves that the safest method, under circumstances like those involved herein, as a rule is the cheapest in the end.

It was stipulated by the parties that the owners of the Arcade building and the owners of the property adjoining such building on the north all traced their title through one Elbridge D. Huggins.    In 1872 the south one-half of lot 11, excepting the south one foot in width thereof, was owned by one John Langlois and the heirs of Peter Robilliard, deceased, and on April 25th of that year Huggins and wife conveyed said one-foot strip to said Langlois and the heirs of said Robilliard, with the following exception and reservation: "Excepting and reserving, nevertheless, the right and privilege of having the wall now standing and partly built on said premises to remain the property of the parties of the first part, but granting, nevertheless, to the said party of the second part the right to use said wall for the purpose of building as now used until the same may be destroyed by fire or other casualty, or voluntarily removed by all the parties interested herein."

There was standing on lot 10 at that time a brick building known as the Merchants Hotel, and the west thirty-nine and one-half feet of the north wall of said hotel, extending back from Main street, was standing upon this one-foot

strip and projected over the dividing line onto lot 10 a distance of about two inches. At the east end of said thirty-nine and one-half-foot strip the wall of the hotel was built towards the south at right angles with said thirty-nine and one-half-foot east-and-west wall, thus leaving an open court between the balance of lot 11 and the north wall of the hotel. Before the one-foot strip was conveyed by Huggins as aforesaid, and for many years thereafter, the wall on this thirty-nine and one-half-foot strip was used by the then owners of the Arcade property and the predecessors in title of *Mann* as a party-wall. The predecessors in title of *Mann* had erected a frame building upon the Mann property, thirty-nine and one-half feet deep, extending back from Main street, using the north wall of the Merchants Hotel as their south wall; and in 1892 the frame building was replaced by a brick building which now stands upon the property, and the south wall was extended an additional fifty and one-half feet, making the total length of the Mann wall ninety feet. In 1908 the entire south one-half of lot 11 became the property of one David Davidson, and in 1911 Davidson conveyed to the Bijou Amusement Company, the owner of the Bijou theater, the east ten feet of the south one-half of lot 11. This reduced the length of the Mann lot to 110 feet.

Counsel for *Mann* argue that inasmuch as Huggins in 1872 was the owner not only of lot 10 but also of this one-foot strip, that in conveying such strip at that time he did so for the purpose of enabling the adjoining owner, his grantee and assigns, to build over the adjacent right of way, supporting such building by a wall to be erected upon such strip; that such purpose was apparent and obvious, and, such being the case, there became attached, by necessary implication, to such strip the right to have such wall supported laterally by the property of the Arcade owners, and that such right of lateral support arose as a necessary implication from said grant, with the result that if at any time in the future the owners of the Arcade made excavations on

their property in close proximity to the dividing line, the expense of supporting the wall to the north would, as a matter of law, devolve upon the owners of the Arcade. In support of his position counsel cite the case of *Durante v. Alba,* 266 Pa. St. 444, 109 Atl. 796, 9 A. L. R. 485, and the case of *Manning v. New Jersey S. L. R. Co.* 80 N. J. L. 349, 78 Atl. 200, 32 L. R. A. n. s. 155. In the *Alba Case,* as will appear from the statement of facts in the opinion:

"The owner of a tract of ground upon which was erected a brick building sold to plaintiffs a part of the land with the building thereon, retaining the balance of the property extending to the side of said building. Subsequently this balance, by various mesne conveyances, became vested in defendant, who proceeded to erect thereon a store, the cellar of which was to extend beyond the bottom of the foundation wall of plaintiffs' house, the division wall whereof was, however, to be used as a party-wall, defendant having purchased from plaintiffs the right to use it. In order to protect it, the contractor for the excavation, when he reached the bottom of the wall, receded back before digging deeper, thus leaving a bench of earth for its support. Subsequently, and after several rainy days, defendant went into the cellar and removed the bench of earth, thus leaving the foundation wall unsupported on the side toward his property. As a result the wall fell, dragging down the rest of the building, and plaintiffs brought this action to recover for the loss thereof."

Further on in the opinion it is held that if the owner "divides the property and conveys the portion with the building on it, retaining ownership of the rest, there arises an implied duty of lateral support of the building as well as of the soil, charged upon so much of the land adjoining the building as is necessary for that purpose; and, unless excluded by the grant, this implication runs with the land in the hands of subsequent purchasers of the retained portion. This distinction is universally recognized both in this country and abroad." Citing a number of authorities.

The *Alba Case* discloses a vital difference in its facts from that of the instant one. The land sold in the former had on it, close to the dividing line, an existing building, and while the instrument of conveyance contained no express grant for lateral support, the law implied such grant as a matter of necessity. Without this implication of lateral support the grantee would not have, permanently, the protection to his building which was clearly intended by the conveyance. In other words, the situation resolved itself about as follows: The grantor sold the land with the building on it to the grantee. By doing so he effectually represented to the grantee that this land, together with the building, shall remain in the future substantially in the same form it was in at the time of the sale, without being burdened with the necessity of supplying lateral support for both land and building. The rule declared in the *Alba Case* is an exception to the general rule heretofore stated, and arises from necessity out of the physical situation which obtained at the time of the grant. The sale of the land in that case, together with the building situated thereon, carried with it the right to have both land and building maintained and protected in the condition it was in at the time of the sale. Had the purchaser of the land with the building thereon added to the height or the weight of his wall, this right of lateral support would not have extended to the additional weight or height, but would have been limited solely to the building as it existed when the conveyance was made. So that, applying the doctrine in the *Alba Case* to the instant case, we find that with the exception of the thirty-nine and one-half-foot wall, the one-foot strip was vacant and unoccupied by any building. Any additional wall placed upon this strip after the sale by the grantee or his successors in title would have furnished an extra weight upon this strip, to protect which, from the standpoint of lateral support, the grantee and his successors in title would

be obligated, and with which obligation the owners of the Arcade property would not be involved.

The *Manning Case* was one where land was condemned to secure a right of way of a railroad. In that case the court held that the plaintiff must be compensated in the award or verdict for the burdens imposed upon his land by reason of the right of lateral support of defendant's right of way to enable it to safely run thereon its trains, engines, and cars. In a note to the *Manning Case* in 32 L. R. A. N. s. 155, various decisions involving condemnation cases of railroads for a right of way are reviewed. Among them is the case of *Connecticut & P. R. R. Co. v. Holton,* 32 Vt. 43, where it is held:

"Although the right which a railroad company acquires to land taken under their charter is said to be merely an easement, yet the nature of their business, their obligations to the community, and the public safety require that their possession of the land so taken should be absolute and exclusive against the adjacent landowner, so far as to secure fully every purpose for which the railroad is made and used. . . . The very purpose for which his land was taken and his damages appraised was to establish a railroad for the safe transportation of passengers and freight; and he has no right reserved in the land, the exercise of which may, in the most remote manner, make such transportation unsafe. *His convenience must yield to the public welfare.*"

Here we have a clear and concise statement of the reason why railroads, in obtaining land by condemnation for right-of-way purposes, are entitled to the protection of their right of way and of their tracks and rolling stock. It is based first upon the acquirement of the right of lateral support, for which they are obliged to pay as an element of damages in connection with the taking; second, because this right of way can be used for no other purpose than for the maintenance of tracks for the operation of its rolling stock; and third, because the traveling public is interested in maintaining such right of way in a safe condition.

Where a person builds several houses connected by a common partition wall, and where these houses are sold to separate owners, the purchasers are entitled to the right of lateral support not only of the soil but also of the building. *Rogers v. Sinshcimer,* 50 N. Y. 646.

So that we have as exceptions to the general rule, first, cases where an owner of a tract of land with a building thereon sells part of the land on which the building stands, retaining ownership of the balance of the land extending to the building, or where either party subsequently sells his interest, the right of lateral support not only of the land but also of the building arises in law, by implication, from necessity. Second, a similar right exists for the protection of a railroad right of way where land is condemned for that purpose, and where in the condemnation the right of lateral support is included and appropriated. Third, where several buildings are constructed by an owner, with a partition wall between the buildings, a similar right is created.

In the Huggins deed special reference is made to the thirty-nine and one-half feet of party-wall. Nothing whatever is said of a proposed wall to be built on the balance of this strip. In fact, the evidence shows that for a period of twenty years thereafter this strip was left unoccupied by any further wall or building. Having specifically made reference to the thirty-nine and one-half feet of party-wall, and having expressly defined the rights of the parties with respect to such wall, which would carry with it all party-wall rights, including that of lateral support according to law, it is highly improbable that either Huggins or his grantee ever entertained any notion whatsoever that the right of lateral support would follow as to any wall which might be erected upon the balance of this one-foot strip. This follows as a natural and logical implication from the grant itself. That this grant of Huggins in 1872 was not intended by the grantee to convey a right of lateral support of a wall twelve feet in height, which would be necessary to inclose the

passageway, is further manifest by the fact that when the predecessors of *Mann* erected the new building they extended the north wall of the Merchants Hotel building a distance of an additional fifty and one-half feet to a height of three stories. Nothing was said at the time of the grant that any wall built upon this one-foot strip should be of any particular height, and if the grantee actually had in mind the building of a wall, it is just as probable and likely that he contemplated not only a cover for this passageway twelve feet in height, but a wall of sufficient height to enable him to make proper use of his property above this passageway. The right to lateral support under such circumstances is confined to the condition of things existing at the time of the grant. 1 Ruling Case Law, 382; 1 Thompson, Real Prop. § 550, where it is said "that this implied right is confined to the *status quo* at the time of the grant, and does not extend to increased burdens thereafter imposed upon the soil." See, also, *Tunstall v. Christian*, 80 Va. 1, 56 Am. Rep. 581.

If the conveyance of this one-foot strip carried with it the right of lateral support not only of the soil but also of a building to be erected thereon in the future, then an owner of two adjoining vacant lots in a business district in a city who sells one of the lots may be charged with an easement of lateral support for any building which the purchaser may see fit in the future to erect upon his lot. A lot in a business district is sold for the express purpose of utilizing it for business purposes, and in the ordinary course of events it is contemplated that at some time in the future a building will be erected thereon with walls coterminous with the lot. It is the common observation that vacant lots in cities are constantly becoming more valuable. This is not only so in the city of Racine but in nearly all of the larger cities of the state. To apply the doctrine of the *Alba Case* to the instant case or to vacant business lots in cities, under

circumstances as above referred to, would practically subvert and revolutionize the doctrine of lateral support, and would wipe out the general ruling and substitute in its place an exception. Nor need we stop with business districts. The same would follow in residential subdivisions.

We have thus far treated the doctrine of lateral support without giving special attention to the claim made by counsel for the defendant *Mann* that the thirty-nine and one-half foot wall was a party-wall. It was used as a party-wall prior to the execution of the Huggins deed in 1872. By that deed the one-foot strip was conveyed by Huggins to Langlois and the heirs of one Robilliard, deceased, the predecessors in title of *Mann,* and the wall itself remained the property of Huggins, but the right was granted to the grantees "to use the wall for the purpose of building as now used until the same may be destroyed by fire or other casualty or voluntarily removed by all of the parties interested herein." The wall as then used as a party-wall was the wall of the Merchants Hotel, standing upon this strip extending east from Main street a distance of thirty-nine and one-half feet. It appears from the evidence that this wall extended two inches to the south of this one-foot strip, and that above the basement it bulged into lot 10 in places a distance of three inches. There is no evidence that any of the parties at the time the Huggins deed was executed had any knowledge of the extension of this wall over onto lot 10. This was ascertained shortly before the trial, and was there testified to. In 1872 Racine was a small city, and although Main street, even at that time, constituted the principal business street, values had not yet assumed such high proportions as exist at the present time.

The court found that when the owners of the Arcade built their new building upon their own property, leaving the south wall of the Mann building standing and intact, they abandoned the old wall as a party-wall, and that such

party-wall agreement thenceforth ceased to continue or to exist, and that as the result, all obligations of lateral support which arose as the result of the party-wall agreement were from that time abrogated and of no further validity or effect. In a sense, the act of the Arcade owners in building their wall entirely upon their own property amounted to an abandonment of the wall on their part; but the party-wall rights were created by the deed in 1872, and while the one-foot strip was conveyed by Huggins he retained the title to the wall, but granted certain rights in connection therewith, which clearly constituted this wall a party-wall, and which could be abandoned only in accordance with the terms of the conveyance in one of two ways: first, by the destruction of the wall by fire or other casualty; and second, by the voluntary removal of the wall by all of the parties interested therein. Surely, the acts of the Arcade owners in tearing down their building and in constructing their own wall did not amount to an abandonment of the wall, or release any of the party-wall rights to which the owner of the south one-half of lot 11 was entitled.

In 2 Cooley, Torts (3d ed.), p. 750, it is said:

"Each proprietor owes to the other the duty to do nothing that shall weaken or endanger it, and though each may rightfully, when he finds it for his interest to do so, increase its height, sink the foundations deeper, or on his own side add to it, yet it seems that in doing so he is insurer against damages to the other proprietor."

Nor is it necessary that a party-wall stand upon both of the properties of the adjoining owners. It may stand partly on the one and partly on the other property, or it may stand wholly upon the property of one of the owners, and nevertheless be a party-wall, with all the rights and obligations belonging thereto. Certainly the abandonment by the Arcade owners of this wall, not being consented or agreed to by *Mann,* could not release the rights that *Mann* had to the lateral support which in law is accorded to him and to the

wall. See, also, 30 Cyc. 781; *Dunscomb v. Randolph,* 107 . Tenn. 89, 64 S. W. 21; *Bernheimer v. Kilpatrick,* 53 Hun, 316, 6 N. Y. Supp. 858; *Henry v. Koch,* 80 Ky. 391; *Miller v. Brown,* 33 Ohio St. 547.

In a note to the *Dunscomb Case, supra,* as reported in 89 Am. St. Rep. 915, at p. 936, it is said:

"It is not essential, however, that the wall should rest equally upon the land of the adjoining owners in order to maintain the easement of support. If the wall has been erected between two buildings, or has been used between or as a part of two buildings under circumstances giving to the owner of each an easement of support in the wall, he is entitled to retain it, though the building may be chiefly or wholly upon or may overhang the land of the other owner (*Henry v. Koch,* 80 Ky. 391); and one owner who has acquiesced in the erection of a party-wall has no right to tear it down, though on his own land, and thus destroy the support of the building of the adjoining owner. *Miller v. Brown,* 33 Ohio St. 547."

From this it follows that while the owners of the Arcade had constructed their own wall, nevertheless the old wall, as far as the defendant *Mann* is concerned, still retains the right of an easement to have this wall, for a distance of thirty-nine and one-half feet, supported by the soil on lot 10, and furthermore, this right for support of the old wall is as extensive as is the right to the support of the soil in its natural condition.

No evidence was introduced of the expense of underpinning the thirty-nine and one-half feet of the wall. The court found in its findings of fact (and such findings are amply supported by the evidence) the cost of underpinning the entire Mann wall. It will therefore be necessary to reverse the judgment of the lower court and to send the cause back for further evidence, so that the cost of underpinning of this thirty-nine and one-half feet of wall may be ascertained and determined by the court, and, when so determined, judgment must be rendered in favor of the plaint-

iff against the defendants *Sklute* and *Komiss* for the value of such underpinning, and against the defendant *Mann* for underpinning of the balance of the one-foot strip belonging to him.

*By the Court.*—The judgment of the lower court is reversed, and the cause is remanded with directions for further proceedings in accordance with this opinion.

A motion for a rehearing was denied, with $25 costs, on October 20, 1925.