## CITY NAT. BANK OF DUNCAN v. SODERBERG.

No. 21077.   Jan. 14, 1935.

Rehearing Denied April 4, 1935.

Wilkinson & Wilkinson and Sandlin & Winans, for plaintiff in error.

Bond & Bond, for defendant in error.

BUSBY, J.   This action involves the title to the west 18 inches of lot 31, block 141, in the city of Duncan, Stephens county, Okla.

Prior to May 22, 1902, W. E. Scott was the owner of lot 30 in block 141, and Wm. A. Williams was the owner of lot 31 in block 141. Lot 31 was immediately east of lot 30. On May 22, 1902, Williams executed a certain warranty deed to W. E. Scott conveying 18 inches off of the west side of lot 31, the material portion of which provides:

"* * * Have bargained, sold, and conveyed and by these presents do bargain, sell and convey unto the said W. E. Scott, the west one-half of said stone wall near the west line of said lot No. 31 of block No. 141 of said town of Duncan, I. T., together with 18 inches off of the west side of said lot No. 31 of block 141, which is supposed to be the width from the center of said wall mentioned to the west line of said lot No. 31 of block No. 141 of Duncan, I. T."

The above deed was not recorded until May 11, 1905.

On February 28, 1921, Scott executed and delivered to W. T. Foreman a warranty deed, the description of the property conveyed being as follows:

"Lot thirty (30) and the west eighteen (18) inches of lot 31 in block 141, in the town of Duncan, Okla., said west eighteen (18) inches of lot 31, block 141, was conveyed to W. E. Scott by W. A. Williams, by warranty deed dated May 22, 1920 (1902)."

On April 15, 1921, Foreman executed a warranty deed to J. J. McAdams, the description of the property conveyed being as follows:

"Lot thirty (30) and the west eighteen (18) inches of lot thirty-one (31) in block one hundred and forty-one (141) in the town of Duncan, Okla. Said west eighteen (18) inches of lot thirty-one (31) block 141 was conveyed to W. E. Scott by W. A. Williams, by warranty deed dated May 22, 1902, according to the official plan and survey of the town of Duncan, Oklahoma."

On March 22, 1923, McAdams executed a warranty deed to plaintiff, City National Bank of Duncan, the description of the property conveyed being as follows:

"All of lot thirty (30) and the west eighteen inches of lot thirty-one (31) in block one hundred and forty-one (141)."

On August 25, 1903, W. A. Williams executed and delivered to Ira Loyd a warranty deed to lot 31. The said deed contained the following exception:

"* * * except an interest in the wall on the east side of said lot heretofore conveyed to J. T. Doak and an interest in the wall

at the west side of said lot heretofore conveyed to W. E. Scott.* * *"

This deed was recorded May 14, 1906.

On October 6, 1911, Ira Loyd executed and delivered to Mamie E. Loyd, his wife, a warranty deed to lot 31. Mamie E. Loyd is the same person as Mamie E. Soderberg, defendant in this action. It is noted that the deed from Williams to Scott was not recorded on the date of the execution of the deed from ·Williams to Loyd. It is contended, however, that the exception mentioned in Loyd's deed was sufficient to put him on inquiry which would have led to the discovery of the rights of Scott in the property.

Prior to the execution of the deed from Williams to Scott, there had been a building constructed on lot 31. The west wall of the building did not extend to the west line of lot 31. The testimony of Scott was to the effect that he intended to purchase a half interest in the property wall, and since there was some space between the east line of lot 30 and the wall it was necessary to purchase 18 inches in order to include half of the wall.

In other words, the center of the wall is located at a point exactly 18 inches east of the dividing line between lots 30 and 31. This is also substantiated by the testimony of W. E. Scott when he stated that his lot 30 was 26½ feet wide, having purchased this 18 inches. When this sale of the "west one-half of said stone wall near the west line of said lot No. 31 of block No. 141 of said town of Duncan, I. T., together with eighteen inches off the west side of said lot No. 31 of block 141" was consummated, the intention of W. A. Williams was to make Scott the owner of the west one-half of said wall, that portion of said 18-inch strip upon which the said wall stood, and the remaining few inches between that wall and the dividing line between the lots.

The deed from Williams to Scott was not recorded until May 11, 1905, and the deed from Williams to Ira Loyd was not recorded until May 14, 1906. Mamie E. Loyd by her deed took the same title that her grantor, Ira Loyd, had, which was clear of defect so far as the record chain of title at that time was concerned.

On May 22, 1902, W. E. Scott received his deed and immediately went into possession of the 18-inch strip here involved. For 19 years W. E. Scott thought he owned not only lot 30, but also this 18-inch strip in dispute. He testified positively that he remained in possession and control of the 18-inch strip up until he sold it to W. T. Foreman. That evidence is not disputed. W. T. Foreman thought he owned not only lot 30, but also this 18-inch strip for about two months. McAdams thought he owned not only lot 30, but also this 18-inch strip for about 12 years. The City National Bank thought it owned not only this lot 30, but also this 18-inch strip for about 11 years. All these transfers were made by warranty deed and in each deed appeared the words "* * * and the west 18 inches of lot 31," etc.

Under color of title, then. each of the plaintiff's predecessors in interest have exercised open, notorious, continuous exclusive, hostile, and adverse possession over this 18-inch strip for the past 31 years.

Plaintiffs herein contend that they and their preceding occupants have been in possession since 1902 of the 18-inch strip off of lot 31, and have, therefore, acquired title by prescription. We believe this contention is well taken. While the plaintiff in error itself has not been in possession of said 18-inch strip for the required prescription period, there is such privity of contract shown to exist, to wit, warranty deed from Williams to Scott, warranty deed from Scott to Foreman, warranty deed from Foreman to McAdams, and from McAdams to the bank, plaintiff in error, each deed purporting to convey lot 30 and this 18-inch strip, and under which in each instance the grantees assumed possession, control, and occupancy of the 18-inch strip, so as to permit the latter to tack its possession to that of its predecessors, and establish an occupancy extending back to 1902.

In C. J. vol. 2, page 82, it is said:

"* * * It is a rule of almost universal application that, if there is privity between successive occupants holding adversely to the true title continuously, the successive periods of occupation may be united or tacked to each. other to make up the time of adverse holding prescribed by the statute as against such title."

Under this simple statement of the law, the above authority cites literally hundreds of cases from practically every state in the Union.

Plaintiff in error is now and has been for a number of years past in possession of and occupying a bank building located upon lot 30, which building extends upon and occupies the 18-inch strip here in dispute and ties into the wall here involved, which wall has long since been raised to a two-story wall. Defendant in error certainly must be

charged with knowledge of the size of her lot which she occupied so long, and, if the same was not the size she thought it ought to be, it was her duty to find out the reason why. It is fundamental law that the possession of real property carries with it the presumption of ownership, and it is the duty of those purchasing such property from others than those in possession to ascertain the extent of their claims, and the open, actual possession of such property gives notice to the world of such interest as the purchaser actually has therein. Shaffer v. Turner, 43 Okla. 744, 144 P. 366; Adams v. White, 40 Okla. 535, 139 P. 514; Hass v. Gregg, 52 Okla. 51, 152 P. 1126; Wilkinson v. Stone, 82 Okla. 296, 200 P. 196; McCormick v. Stonebraker, 133 Okla. 34, 270 P. 1098.

In the case of Tittle v. Robberson, 143 Okla. 97, 287 P. 1011, it is said:

"It has been decided, in a long line of cases, that one who proceeds with knowledge of such facts as will put a prudent man upon inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith and is chargeable with actual notice. Cooper v. Flesner, 24 Okla. 47, 103 P. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29; Herbert v. Wagg, 27 Okla. 674, 117 P. 209. A multitude of cases could be cited to support this proposition, but it is so well settled as to become axiomatic that one who takes with notice of an equity takes subject to that equity. Thompson v. Wilkinson, 46 Okla. 115, 148 P. 177."

Adverse possession of real estate for the period of time prescribed by the statute (section 99, O. S. 1931), ripens into title by prescription. Adverse possession may be either under claim of right or color of title. When an occupant of land is in possession thereof under a deed which purports to place the title in him, he is holding adversely under color of title, and his possession is deemed to include all lands included within the boundaries named in the occupant's deed. Martin v. Cox et al., 31 Okla. 543, 122 P. 511. Thus the continuous possession of the 18-inch strip of land described in the deed thereto for a period in excess of 15 years ripened into title by prescription in the adverse holder.

In view of the deed of conveyance to the 18-inch strip involved in this action and the adverse possession thereof, the property line now corresponds to the center of the wall, and the respective owners of the adjoining properties each owns a one-half interest in the party wall.

The cause is remanded to the trial court, with directions to enter its judgment quieting title to the 18-inch strip in the plaintiff, and to decree the respective interests of the parties in the party wall in accordance with the views expressed in this opinion.

RILEY, C. J., and OSBORN, WELCH, and BAYLESS, JJ., concur. SWINDALL and McNEILL, JJ., dissent. CULLISON, V. C. J., and ANDREWS, J., absent.

McNEILL, C. J. (dissenting). I am unable to concur in the views announced in the majority opinion.

This action involves a party wall. Plaintiff seeks to quiet title in and to a longitudinal 18-inch strip of land lying on the west side of lot 31, block 141, in the city of Duncan, which adjoins lot 30 on the east. The west boundary line of the 18-inch strip forms the dividing line between said lots, and the east boundary line of the strip coincides with the medial line of the wall. So that the west one-half of the wall is located on the east nine inches of this strip, and the west nine inches of the strip intervenes between the wall and the dividing line between said lots. For the sake of clarity this is illustrated as follows:

A.- DIVIDING LINE BETWEEN LOTS 30 AND 31
B.- 9 INCH STRIP INTERVENING BETWEEN LOT LINE AND WALL
C.- CENTER LINE OF 18 INCH WALL
D.- 18 INCH WALL
A. TO C. = 18 INCHES.

It appears that W. A. Williams, in 1902, and prior thereto, was the owner of both of these lots; in 1899, a stone building was erected entirely upon lot 31. It happened that the west wall lacked about nine inches from meeting the line of division between said lots. We are concerned with this intervening strip and that portion of the soil lying under the west half of said wall. The instant action was instituted on December 6, 1927, and at that time the stone building was standing on lot 31. It is conceded that no portion of lot 30 was ever lying under said west wall of said stone building.

A wooden building was constructed on the west side of lot 30 in about 1893. This building covered only 24 feet and no part

of the same was ever tied into the wall of the stone building on lot 31. This wooden building burned in 1901. Lot 30 then remained vacant and unimproved for about eight or ten years. In about 1909, or 1911, this being the most accurate and only information obtainable on that point, a permanent building was erected on lot 30 and the intervening nine-inch strip lying between the west outside boundary line of said wall and the dividing line between said lots. This permanent building, erected on lot 30 and said nine inches of the 18-inch strip, was tied into and it made use of the stone wall. The outside west part of the stone wall was used as the inside wall of the permanent building on lot 30.

On May 22, 1902, being subsequent to the burning of said wooden building on lot 30, Scott obtained a warranty deed from Williams covering 18 inches off the west side of lot 31 and an interest in said west wall. This deed in part recited, as follows:

"In consideration of one hundred ($100) dollars and for further consideration of one-half (½) interest in second story wall to be built by the said W. E. Scott on the now one story wall near the west line of lot 31, block 141, of town of Duncan, I. T., does bargain, sell and convey unto the said W. E. Scott west one half (½) of stone wall near the west line of lot 31 block 141 of town of Duncan, I. T., together with eighteen (18) inches off the west side of said lot 31, block 141, which is supposed to be the west line of lot 31, block 141 of Duncan, Okla."

Scott did not record this deed until May 18, 1905, which lacked four days of being three years from its execution, and, by reason of his neglect or failure to file the same, the present controversy has resulted. Prior to the recording of the deed from Scott, to wit, May 18, 1905, Williams had executed on August 25, 1903, a warranty deed to Ira Loyd covering lot 31, which deed contained the exception referred to in the majority opinion, to wit:

"* * * except an interest in the wall in the east side of said lot heretofore conveyed to J. T. Doak and an interest in the wall at the west side of said lot heretofore conveyed to W. E. Scott. * * *"

Loyd immediately took possession of the building and recorded his deed on May 14, 1906. Loyd, at the time he received his deed from Williams, had no notice, actual or constructive, that Scott had purchased the west 18 inches of lot 31. The trial court so found. But it is urged that the exception in the deed to Loyd was sufficient to put

Loyd on notice that Scott claimed an interest in the land under a portion of the wall. It is to be observed that the exception in the deed omitted any reference to the 18 inches of land mentioned in the deed from Williams to Scott. I maintain that the only notice open to inquiry upon the part of Loyd was the nature of servitude set forth in the exception in his deed, and that servitude was the right of Scott to use the west wall as a party wall, and that exception was no notice of any grant of title to the soil under the wall. On October 6, 1911, Loyd executed a deed to lot 31 to his wife, Mamie E. Loyd, being one and the same person as Mamie Soderberg, defendant in error herein, to affect a property settlement in a divorce proceeding pending between them. This deed to the wife made no reference to the wall or the strip of land in question. If Loyd became vested with title to lot 31, subject to the interest of Scott in the wall, he having purchased same for a valuable consideration without notice of Scott's unrecorded deed to the 18-inch strip, then Mrs. Loyd, although she had constructive notice of the recorded instruments affecting the 18-inch strip prior to the time she received her deed from her husband, comes within the well-recognized rule that a purchaser, with notice from a purchaser without notice, may claim the immunity of her grantor without notice. Mrs. Loyd's grantor was a purchaser in good faith without notice, and she could find shelter under the same protection as her grantor. Hawkes v. Hoffman, 56 Wash. 120, 105 P. 156.

This is an equitable action and the trial court rendered a judgment finding that Mamie Soderberg was the owner of the west 18 inches of lot 31 and the owner of the east half of the wall on the west side of said lot, and the bank was vested with the title to the west half of the wall at the west side of lot 31, but not to any of the land under the wall.

On the third day of October, 1933, this court rendered an opinion in this cause affirming the judgment of the trial court. Subsequently this court granted a rehearing, and on January 14, 1935, the instant opinion was delivered reversing the judgment of the trial court and quieting title in the land in question in the City National Bank.

In the petition for rehearing filed by the defendant in error on February 13, 1935, counsel for defendant in error set forth a very clear and concise statement embodying positive and uncontroverted facts, as I view them, and law applicable thereto. These

matters are presented in such a straight-forward manner that I desire to quote from the petition for rehearing as follows:

"* * * We believe * * * that the decision, rendered on the 14th day of January, 1935, is in conflict with the numerous decisions cited by us in our original brief. We find from our research of authorities, that the courts make a distinction between an interest in the ground and an interest in a party wall situated on the ground with reference to the rule that a purchaser is put upon inquiry; that authorities we find do not apply this rule to the sale of an interest in a party wall. In 21st Am. and Eng. Enc. of Law (2nd Ed.) page 587, it is said:

" 'Where information of a specific claim or right is given to a person, it has been held that such information is operative only in respect to the particular fact communicated and will not put the person notified upon inquiry as to any other or different right.'

"The same rule is expressed in 39 Cyc., page 1712; also by the Supreme Court of Minnesota in the case of Thompson v. Lapsley et al., 96 N. W. Rev. 788; Equitable Building & Loan Association v. Corley et al. (S. C.) 52 S. E. 48; Hawkes v. Hoffman et ux. (Wash.) 105 P. 156; Dickey v. Henarie, 15 Ore. 351; Fire Assoc. v. Flournoy, 84 Tex. 632, 31 Am. St. Rep. 89; Wynne v. Admire (Tex. Civ. App. 1896), 37 S. W. Rep. 33; Cambridge Valley Bank v. Delane, 48 N. Y. 326. In Devlin on Real Estate, volume 3 (3d Ed.) page 2741, it is said:

" 'If before the execution of the deed, the purchaser under a contract for the purchaser of a city lot with improvements, learns that there is a party wall agreement, he is not justified in refusing a deed or recovering back the amount paid by him as such an agreement does not constitute a defect in the title.'

"This case involves a portion of lot 31 on the west side thereof, in block 141, in the city of Duncan. W. E. Scott, through whom the plaintiff in error claims title, testified that he got his deed from Mr. Williams conveying him the 18 inches of lot 31 on May 22, 1902, and that at that time he, Scott, was in possession of lot 30, and that when he took his deed to the 18 inches of lot 31, there was already a wall on the west side of lot 31. Mr. Scott also testified that he put a wooden building upon his lot, lot 30, in 1893, and that his building was 24 feet wide (C-M 52), so his building did not come up to the line between lots 30 and 31, and he says that all of the stone wall was on lot 31 (C M 53-54), so his wooden building on lot 30 did not come to the wall on lot 31; his box building was on the west side of his lot (C-M 52-53).

"D. A. Fowler, who was a witness for the plaintiff in error, testified that there were no improvements on lot 30 in 1902 (C-M 57); that Scott's frame building had burned down prior to that (C-M 57). The fire which destroyed Scott's wooden building occurred in 1901, and Mr. Fowler, as we have quoted, stated that Scott's building burned down prior to 1902, and that it was some eight or ten years after the fire before there were any permanent improvements on lot 30 (Scott's lot) and before Scott tied on to the wall (C-M 57).

"When Loyd took his deed to lot 31, according to the testimony of Mr. Fowler, lot 30 was vacant and Scott had nothing tied onto the wall which was situated on lot 31. As said in 4 R. C. L. 120, it is presumed that a man's lot extends to the lot lines on each side and no further. We believe this court, in its opinion rendered January 14, 1935, has proceeded upon the theory that Scott had improvements on lot 30, and that his improvements extended to the wall on the west side of lot 31. At the time Loyd took his deed, it is shown that there were no improvements on lot 30. In 23 Am. and Eng. Enc. of Law (2d Ed.) p. 504, it is said in the contest.

" 'In order for possession to constitute notice, it must be a present possession, existing at the time of the purchase which is sought to be impeached.'

"If the possession, which puts a purchaser on notice, must be a present one, then there was nothing to put Loyd on notice of any interest Scott might have in the wall except the recital in the deed from Williams to Loyd conveying lot 31, which excepted an interest in the wall at the west side of said lot. We believe strongly that in the absence of actual possession by Scott, or someone for him, that the recital in the deed alone did not require Loyd to make any inquiry of Scott as to any interest he might claim in the ground on which the wall stood.

"The building which Scott put on lot 30 was only 24 feet wide (C-M 52), and according to the testimony that building was destroyed by fire in 1901, and the lot remained vacant for some eight or ten years before any permanent improvements were put on it, and during that term of vacancy Loyd took his deed to lot 31. We do not believe the record in this case is convincing that Scott and his grantees had been in possession of the 18 inches on the west side of lot 31 so as to put Loyd on notice. Mr. Devlin, in his work on Real Estate, vol. 2 (3d Ed.) sec. 774, speaking of possession sufficient to put a purchaser on notice, says it must be occupancy, something more than successive and occasional entries on the land; and that it must be of such a nature as would suffice to constitute a disseisin or adverse possession; and in the same work, sec. 769, Mr. Devlin says:

" 'The possession to have the effect of notice must be of that character that the attention of a purchaser is at once called to it. It must be open, distinct, exclusive and unequivocal.' "

I am of the opinion that the contentions raised in the petition for rehearing are sound. It seems to me that my associates have not sufficiently gleaned the facts from the record and as a result they have misdirected themselves as to the law relating to an easement acquired by prescription as distinguished from the land itself. Land may be acquired by prescription and a freehold estate obtained in that manner, but when an easement is acquired by prescription the grant of a use is obtained and not the freehold of the soil. Washburn on Real Property, vol. 2, p. 273, sec. 1228. An easement in a party wall was unknown at common law. Our statute specifically provides that the right to use a wall as a party wall is an easement, a burden or servitude upon land. Section 11774, O. S. 1931, provides as follows:

"The following land burdens or servitudes upon lands, may be attached to other land as incidents or appurtenances, and are then called easements: * * * Twelfth. The right of using a wall as a party wall. * * *"

There are only three ways by which an easement is acquired, by express grant, by implied grant, and by prescription. Washburn, supra, sec. 1231.

It is not necessary that a party wall should stand upon both of the properties of adjoining owners. It may stand partly upon the property of one and partly upon the property of the other, or it may stand entirely upon the property of one, and be a party wall with all the rights and obligations belonging thereto, provided it was so intended or subsequently recognized and treated by the owner as such. Christensen v. Mann (Wis.) 204 N. W. 499.

The dominant purpose of a party wall is so that each adjoining owner may have the right to use such a wall for the support of his building.

Tiffany, on Real Property, vol. 2, page 1244, states as follows:

"A 'party wall' is a division wall between two buildings belonging to different persons, in which each of such persons has certain rights of use or ownership, or both. The term, as stated in a modern English case, has been used in connection with division walls in four different senses. It may refer to (1) a division wall of which, with the land beneath it, the owners of the two

adjoining buildings are tenants in common; (2) a wall divided longitudinally into two strips, each of the adjoining owners owning the strip on his side, and having a right to use that strip only; (3) a wall located entirely upon the land of one of the adjoining owners, and belonging entirely to him, but subject to an easement in the other to have it maintained as a division wall between the two properties and to use it for purposes of support; or (4) a wall divided longitudinally into two strips, each of the adjoining owners owning the strip on his side only, but having an easement in the other strip for the purposes of the support of his buildings.

"In England, a division wall is presumed to belong to the first of the above classes. In this country, no such presumption has ever been recognized, and a party wall almost invariably belongs to the fourth class mentioned above, except in a few cases in which it belongs to the third class as having been built entirely on the land of one proprietor. For this reason, it seems proper to consider the subject of party walls as a part of the law of easements, though a party wall of the first or second class involves no application of that law."

Washburn, on Real Property (6th Ed.) vol. 2, sec. 1301, states as follows:

"Party-Walls, Continued.—It does not seem to be necessary that a party wall should stand half upon each of the adjoining parcels of land. It may stand half upon each or wholly upon one, and may, or may not, be the common property of the two proprietors. The rights of the parties in respect to the same may be collected and determined from the manner in which the parties have used the same for the period of time requisite to create a prescriptive right. The rights of adjoining landowners in party walls in cities are frequently defined by an agreement under seal, in which it is agreed between the owners of the adjoining lots, their heirs and assigns, that either may build a party wall, half on each lot, and that the wall shall remain the property of the builder until the other owner uses it as a party wall and pays half the cost of building. * * *"

McAdam, in his text on Landlord and Tenant (4th Ed.) page 1196, section 343, in describing a party wall, states:

"In populous cities the value of land and proper economy in its use have given rise to party wall easements. The subject suggests many interesting questions affecting the rights and liabilities of those owning adjoining lands, separated by party walls. These walls are generally used between two estates for their common benefit, in supporting adjoining buildings. They may rest entirely upon the land of one, or upon that of two adjoining owners in equal or in any

other agreed proportions. The easement is created by grant, agreement or prescription. * * *

"A party wall, in the legal sense of the term, can only exist in two ways, i. e., by contract or statute. The common law creates no such right, unless it might arise by prescription.

"The term 'party wall,' in its ordinary signification, means a dividing wall between two houses to be used equally for all the purposes of an exterior wall by both parties; that is, by the respective owners of the houses. This use in its full unrestricted sense embraces not only the use of the interior face, or side of the wall, but also such use of it as is necessary to form a complete and perfect junction, in an ordinary, good mechanical manner, between it and the other exterior walls of the house.

"The property in a party wall, erected at the joint expense of two proprietors, ensues the nature of the tenure of the land on which it stands. There is no transfer of property, but the parties are severally owners of their respective parcels as before; and each for any injury to the portion of the wall standing on his own soil, has the ordinary remedy."

It is to be observed that McAdam announces the rule that the property in a wall ensues the nature of the tenure of the land on which it stands. In the instant case the title to the soil under the wall was in Loyd when he purchased lot 31 from Williams.

It is my opinion that it cannot be disputed that Loyd took title to the soil under the west wall when he obtained a deed from Williams. Of course Loyd would not have obtained this title to the soil under the west wall had Scott placed his deed of record prior to the time Loyd purchased lot 31. Scott having failed to place his deed of record, Loyd was an innocent purchaser for value and became the owner of lot 31 in its entirety, save and except the right of Scott and his grantees to make use of the west wall on lot 31. In other words, the wall on lot 31, in the language of McAdam, ensues the nature of the tenure of the land on which it stands.

In the case of Hoffman v. Kuhn, 57 Miss. 746, 34 Am. Rep. 491, plaintiff and defendant were the owners of adjoining lots. Brick buildings were connected by a party wall, one-half of which rested on either lot. The buildings had been constructed more than 20 years by one who owned both lots. In 1879, the building of the plaintiff was totally and that of the defendant partially destroyed by fire. The party wall was somewhat injured. Both received payments for injuries upon the basis that the party wall had been rendered useless and would have to be rebuilt. The defendants began to repair their house, using the old party wall. The plaintiff sought to enjoin them, alleging that the wall was unsafe and praying it should be torn down and rebuilt from the foundation if it was to be used as a party wall. The defendants contended that the wall was safe and trustworthy. The chancellor found that the wall was not materially injured and was suitable for the purposes of a new building similar to the old, and dismissed the plaintiff's action. The Supreme Court held that, independently of the question of the condition of the wall, the plaintiff was entitled to the relief prayed and this relief should not be denied because he rested his claim upon improper grounds. The court held that upon the destruction of the house the easement in the party wall, previously enjoyed, was put to an end and that either owner might dispose of that part of the wall on his own soil as he saw fit, as each was the owner in severalty of his own soil and of so much of the wall as stood upon it. In that case it was said:

"The owners of adjoining buildings, connected by a party wall resting partly upon the soil of each, are neither joint owners nor tenants in common of the wall. Each is possessed in severalty of his own soil up to the dividing line, and of that portion of the wall which rests upon it; but the soil of each, with the wall belonging to him, is burdened with an easement or servitude in favor of the other, to the end that it may afford a support to the wall and building of such other. Each, therefore, is bound to permit his portion of the wall to stand, and to do no act to impair or endanger the strength of his neighbor's portion so long as the object for which it was erected, to wit, the common support of the two buildings, can be subserved; and each will consequently be liable to the other for any damage sustained by a disregard of this obligation. But the obligation ceases with the purpose for which it was assumed, namely, the support of the houses of which the wall forms a part. If those houses, or either of them, are destroyed without fault upon the part of the owner, he is not bound to rebuild in exactly the same style and in exactly the same spot because his neighbor demands it. That this is true, where the wall itself is swept away with the house, is settled by authority. Partridge v. Gilbert, 15 N. Y. 601; Sherred v. Cisco, 4 Sandf. 480. It must be equally so where the wall alone remains. A wall is but a portion of a house, and the one is valueless without the other. To hold that so long as the wall

stands the owner whose house has been destroyed is compelled to lose the use of his lot or to replace the destroyed building with another of exactly the same pattern, is to sacrifice the greater to the less, and to impose in perpetuity a servitude which was assumed only for a specific purpose. Such a doctrine, if enforced in the growing towns and cities of America, where localities which are dedicated at one time to residences are swallowed up in a few years by the encroaching demands of trade, would be intolerable. If he who has, in conjunction with his neighbor, erected dwelling houses with party walls, is thereby obliged, as often as his residence is destroyed, to replace it with one of exactly similar pattern, it would seriously impair the value of property and impose fetters on its ownership too rigorous to be endured. We think the obligation is only that so long as the houses stand the owner of neither shall do anything to impair the property of the other, and either shall be at liberty to repair and keep in order the common wall; but when, without the fault of either, the houses are destroyed, the easement is at an end, **and each becomes the owner in severalty of his own soil** and of so much of the wall as stands upon it, with a perfect right to tear it down or dispose of it in any way he sees proper. The decree will be reversed and the cause remanded, with instructions to enter a decree for the complainant; but as the complainant, by tendering a false issue, is responsible for much of the costs incurred, the costs of the lower court will be divided, the appellees to pay costs of this court."

In the case of Barry v. Edlavitch, 84 Md. 95, the Supreme Court of Maryland considered a case where the parties were the owners of adjoining houses. The plaintiff's house was north of defendant's house. The front part of the wall between the houses was built one-half on each of the two lots and the rear wall was wholly on the site described by defendant's deed and was from four to eight inches south of what would be the dividing line between the two houses. The houses stood in this condition for 50 years, and the rear portion of the wall, although wholly within defendant's lines, had been used as a support for the house on plaintiff's lot.

The defendant sought to tear down the building and erect a new and larger building. In that case the court said:

"Possession per se, can never afford the presumption of a grant, so as to conclude the real owner. The possession must be open, known to the other party, and adverse to some right in the owner. It is only from the fact that such possession, amounting as it does to a continuous claim of title, has been acquiesced in for 20 years, that the presumption of a grant is afforded. So that, from the very statement of the nature of title by prescription, it is obvious that the presumed grant can never extend farther than the user, in which the other party has acquiesced. These principles are so well established as to require no citation to support them. They are applicable to the acquisition of easements. Washburne on Easements, 74 Marg. (3d Ed.); Parker v. Foote, 19 Wendel, 313. And we think are fully sustained by the decisions of this court. * * *

"So, also, in Putzel v. Drovers' Bank, 78 Md. 360, this court uses language entirely in accordance with the view above expressed; they say; 'Under these circumstances the law considers that he had a prescriptive title to the use of it (the division wall), in the manner in which he had enjoyed it. * * * To the extent of such use his title is clearly established. * * * The bank retained all its rights in the division wall which are not inconsistent with the enjoyment of the easement. It was bound to permit it to be used as a support for Putzel's house in the accustomed manner; but this is the limit of its obligations.' * * *

"On the other hand, in McLaughlin v. Cecconi, 141 Mass. 254, where the party claimed by adverse user, the court held that the defendant could continue to burden the wall to the extent of her use; **but she cannot enlarge or add to the rights acquired by adverse occupation except by some other title.'** Matthews v. Dixey, 149 Mass. 597; Everett v. Edwards, 149 Mass. 591.

"Now, in this case, the wall in question stands wholly on the land of Barry, and there is nothing in the case, beyond this fact, to explain the use of the wall by Edlavitch. Such use, it is not perceived, could be of benefit to Barry. It was a mere burden upon his property, open, adverse and acquiesced in by him. No other inference whatever can be drawn from its existence, except that which the law implies, viz., a grant to do the things that had been done for so long a time. There is nothing in the case from which it can be presumed that either party intended that the wall should be a party wall, except to the extent and for the purpose of supporting the appellee's building, as it had been supported for so many years. That was, therefore, the extent of the appellee's right, namely, to enjoy the use of the wall for the support of his house as it then existed. The wall being the property of the appellant and on his own lot, there can be no reason assigned why he could not strengthen it and add to its height if he chose to do so; provided it was done without detriment to the other party's right. * * *

"In a word, the appellee had a full right to maintain his easement to the extent of the ancient user; and any encroachment

thereon by the appellant was an invasion of his rights.

"The record shows that, by the description contained in his deeds, the appellee's lot does not include a strip of land between four and eight inches wide to the north of the wall; and, if this be so, it is contended the appellee is not entitled to tack his possession to that of his predecessors, and his case must fail for want of title to that portion of the building and lot which lies between his south line and the wall in question. But we do not think this case raises such a question.

"It is conceded that John Braunt, under whom the appellant claims, occupied the lot for more than 20 years, and during the whole of his possession used the wall for the support of his house in the same manner and to the same extent as did those (including the appellee) who afterwards owned and occupied it. Such possession, therefore, undoubtedly was sufficient to and did confer upon him a title to the easement, whatever its nature was. Now, what was the full extent of his easement? He not only acquired a right to the use of the wall to support his house, but also to do that which was obviously necessary to the enjoyment of that right; that is, to occupy the space intervening between the wall and his own line. The easement which the adverse possession conferred upon him included an easement to use the soil that intervened between his property and the wall. The grant of an easement carries with it all that is absolutely necessary to the enjoyment of it. 1 Wm. Saunders 323, note 6; Washburne on Easements 25 (star paging). He acquired no title to the soil. His right was merely an easement over it; to use it, as appendent to the principal easement of a right of support, in the wall of the adjoining proprietor, and necessary to its enjoyment. Leonard v. White, 7 Mass. 6; Nicodemus v. Nicodemus, 41 Md. 536."

In the case of Scottish-American Mortgage Co., Limited, v. Russell (S. D.) 104 N. W. 607, it was held in the syllabus as follows:

"The provision in a contract between owners of adjoining lots, authorizing either to build a party wall on the line, the other, when using it, to pay half the cost, 'and the said parties hereby convey to each other such interest in the land to be covered by said party wall as may be necessary to carry out the terms of this agreement,' does not convey a fee simple, but merely gives an easement.

"The presence of a party wall on the dividing line between adjoining lots is not constructive notice to a purchaser of one of them, so as to make him liable, on using the wall, for half of its cost, under the unrecorded contract between his grantor and the owner of the other lot, whereby each conveyed to the other such interest in the land to be covered by the wall as should be necessary to carry out the agreement, and either was authorized to build the wall, the other, on using it to pay half the cost."

In that case the facts are quite similar to the facts in the instant case. The action was for an injunction to enforce payment for a party wall. Plaintiff was the owner of lot 18 and the defendant the owner of an adjoining lot. In 1889, Phillips was the owner of lot 18 and Hare was the owner of lot 17. These parties entered into a party wall contract. This contract was not recorded until after Hare had conveyed lot 17 to the grantor of the defendant. Phillips commenced constructing a building on lot 18 shortly after the execution of the party wall contract. The wall was constructed in accordance with the agreement. The center line of the wall coincided with the dividing line between the two lots. The building was completed prior to July 5, 1892. On that day Hare, the owner of lot 17, made a deed to the person through whom the defendant claims title. The deed was filed for record on July 5th, at ten o'clock, and the party wall contract was filed on the same day at 3:45 p. m. The purchaser from Hare had no notice of the terms of the party wall other than the notice of the existence of the building and the party wall. It was contended by the appellant that even though the defendant's grantor had no constructive notice of the party wall by reason of the recording of the contract, still the erection of the party wall, one foot on lot 17, constituted constructive notice of the existence of the contract, which was binding upon her grantor and those claiming under him by reason of a certain clause in the contract. It was contended that this clause in the contract passed a fee-simple estate to that portion of lot 17 covered by the party wall. The court held otherwise. The court said:

"* * * It does not purport to convey an absolute fee-simple title, but simply such interest in the property as may be necessary to carry into effect the terms of the agreement. Certainly there could have been no such intention between the parties as that of conveying to each other the fee-simple title of the ground upon which the party wall was to be constructed. If we are correct in the view we have taken that the contract simply granted an easement in the party wall, then it logically follows that the existence of the party wall was not constructive notice of an agreement between the parties. No case has been called to our attention, and we think none can be found, in which the existence of such a wall has

been held to give constructive notice of the existence of an agreement binding the owner of an adjoining property to pay a portion of the expense incurred in the erection of such wall, and the only constructive notice that seems to have been recognized by the courts is that imparted by the recordation of the party wall agreement. It seems to be quite uniformly held by the authorities that one purchasing property of the owners, who has entered into a party wall agreement, without notice, actual or constructive, of the existence of such an agreement, is not bound thereby to pay any portion of the expense of the wall in order to entitle him to use of that portion situated on his or her lot; and the authorities are not in harmony as to the right of a grantee of one who has entered into a party wall contract to recover of the owner, or the grantee of such owner of an adjoining lot, a proportion of the expense for the erection of such wall, though the grantee of the owner erecting such wall acquired the right of his grantor to the easement incident to such a party wall."

In the case of Duncan v. Rodecker et al. (Wis.) 62 N. W. 533, it was held, as shown by the syllabus, as follows:

"(1) One who, in constructing an addition to his building, using the south wall thereof as the north wall of the addition, conveyed the portion of the lot on which the addition stood, describing it as the 'south 26 feet, more or less,' of the lot, with 'the undivided one-half of the wall on the north side of the above-described premises.' Held, that the grantee took only an easement in the wall, and not any part of the land on which it stood.

"(2) Where one owning an easement in a wall which forms a side of his building, after the destruction of the wall and building, erects a new building on a different foundation, he thereby abandons and extinguishes the easement.

"(3) One who has an undivided interest in a partition wall cannot, after the destruction of the wall, sue in ejectment one placing a building on the half of the land on which the wall stood next his own land."

I have taken the liberty of emphasizing in the foregoing opinions.

In reference to the title to lot 31 acquired by Mrs. Loyd from her husband, it appears to be the uniform ruling of the courts that she was entitled to claim the immunity of a purchaser without notice. Her grantor was without notice of the 18-inch strip having been deeded by Williams to Scott, and even though she had constructive notice by reason of the subsequent recording of the deeds, nevertheless she had the right to claim the immunity of her grantor, and as such grantee she acquired a good title to the whole of said lot 31, except the recognized easement, and she could shelter herself under the protection which the law accorded her grantor. Mrs. Loyd, as such subsequent purchaser, took the rights acquired by her grantor, even though she was charged with notice that the subsequent conveyances of the strip in question were of record at the time she received her deed from Loyd. It was said in the case of Hawkes v. Hoffman, 56 Wash. 120, 105 P. 156, by the Supreme Court of the state of Washington as follows:

"The right of the appellants to claim the immunity of purchasers without notice cannot, of course, be questioned. Although they had actual notice themselves of the existence of the party wall agreement, it is conceded that their grantor had no such notice, and the rule is that a purchaser with notice from a purchaser without notice may claim any immunity his grantor has because of the fact. 'The reason is to prevent a stagnation of property, and because the first purchaser, being entitled to hold and enjoy, must be equally entitled to sell.' Chancellor Kent, in Bumpus v. Platner, 1 Johns. Ch. (N. Y.) 213. See, also Stanley v. Schwalby, 162 U. S. 255-276, 16 Sup. Ct. 754, 40 L. Ed. 960; 2 Warvelle on Vendors, p. 606."

Thompson on Real Property, vol. 5, page 262, par. 4208, states as follows:

"A purchaser with notice may acquire a good title from one who was a purchaser for value without notice. The rule that a purchaser of property, with notice of some prior adverse claim to or interest in such property, takes subject to such interest, is subject to the limitation that, if a person with such notice acquires a legal title to the property from one who is without such notice, he is entitled to the same protection as his vendor, as otherwise it would very much clog the sale of estates. A purchaser without notice would otherwise be deprived of the full measure of protection to which he is entitled, that is, a free right of disposal,

—the right to sell and transfer a perfect title to any purchaser. The rule is obviously necessary to secure to a purchaser, without notice, the full benefit of his purchase.

"Therefore, if a person takes a mortgage or other conveyance with notice of a prior incumbrance, but takes it from one who purchased for value without such notice, and therefore acquired a title good against such incumbrance, such subsequent purchaser with notice may shelter himself under the protection which the law affords his grantor; he takes the latter's rights. Thus a person charged with notice may take a valid conveyance from a purchaser of realty for value without notice of a prior unre-

corded conveyance, or incumbrance. The grantor must, however, have been a purchaser for value, and not merely a volunteer who took a title subject to equities, as in such case the purchaser from him would take subject to the same equities. * * *"

See, also, 66 C. J. 1188, sec. 1045; 27 R. C. L., page 648, sec. 648; Thompson on Real Property, vol. 5, p. 262, sec. 4208; Wade on the Law of Notice (2d Ed.) p. 42, sec. 62; 1 Johnson's Ch. 213.

Under these authorities the title of Mrs. Loyd cannot be questioned as to the entire lot 31, save and except the interest in the wall mentioned in the deed from Williams to Loyd. I conclude that Loyd being an innocent purchaser for value to lot 31, save and except the interest mentioned in the deed of conveyance to him from Williams, regarding the interest conveyed in the wall was not required to search further under the facts and circumstances shown by this record of any interest that any one might have in the land underlying the wall. The deed specifically conveyed to him a freehold estate, a fee-simple title in and to said lot according to the plat and survey thereof, excepting therefrom an interest in the west wall which constituted said wall a party wall for the use of lots 30 and 31. It is well to remember that the deed from Williams to Scott conveyed an interest in the wall and a fee-simple title in the 18 inches, making two essential features in the deed, and Scott testified that he purchased the 18-inch strip and the interest in the wall because he "wanted a building interest in the wall." In this connection it is to be remembered that the one essential feature in the 18-inch deed from Williams to Scott, to wit, the conveyance of the fee in the 18 inches, was omitted from the deed of Williams to Loyd, probably through error on the part of Williams; nevertheless, this feature was not in the exception in the deed from Williams to Loyd.

The controversial question comes as to the nature of the property in the wall located entirely on the west side of lot 31 and whether Loyd was required to search further and inquire as to whether Scott had also obtained a deed to any of the land under the wall. No question has ever been presented that the wall in question was ever considered by any of the parties in any other respect than as a party wall.

The wall was never used as a party wall until 1909 or 1911, but the right to use it as such existed so far as Loyd was concerned

from the time Loyd acquired his deed. When a party wall is destroyed its purpose and necessity for support has ended and the soil thereunder remits to the owner of the land stripped of the right of easement theretofore existing. It is this principle of law which is entirely ignored by the majority opinion. None of the cases cited in the majority opinion deal with a party wall. The syllabus reflects no law applicable to a party wall. The use of a party wall may be obtained by open, adverse, and hostile possession, but that prescriptive right so acquired is nothing more than a right of easement, and the right of easement can never enlarge that right so that the right of easement partakes of the nature of a grant in fee.

The rule announced in 21 Am. and Eng. Enc. Law (2d Ed.) 587, is stated in the petition for rehearing, to wit:

"Where information of a specific claim or right is given to a person, it has been held that such information is operative only in respect to the particular fact communicated, and will not put a person notified upon inquiry as to some other or different right."

This question has been before the court in a few cases. These cases are not easy to find. In the case of Thomas v. Lapsley et al. (Minn.) 96 N. W. 788, it was held:

"Notice of a specific title or interest in real property is operative as to a purchaser charged therewith in respect to the particular title or interest specified only and is insufficient to put such purchaser upon inquiry as to some other inconsistent right."

In other words, a purchaser is not bound or charged with notice of deeds lying outside of his chain of title. In this case the interest in the party wall does not come through the chain or channel of the title of Loyd. It is my view that Loyd was not required to search to ascertain if his grantor had conveyed the land under the wall. His deed conveyed to him the whole of said lot, and this contained the soil under the wall. There was nothing to call Loyd's attention to any fact other than the fact that an interest in the wall had been sold to Scott, and it must not be forgotten that the entire wall was located on lot 31, which Loyd had purchased. Loyd was only chargeable with such facts as the law imposed upon him. Even vague rumor or suspicion, which is nowhere present in the instant case, "is not sufficient foundation upon which to charge a purchaser with knowledge of a title in a third person." Stanley v. Schwalby, 162 U. S. 255, 40 Law Ed. 960.

In the case of Equitable Building & Loan Association v. Corley (S. C.) 52 S. E. 48, it was held that where a mortgage securing a bond refers to the bond for conditions, and the bond is not recorded, it is not notice to the purchaser of the land of any other conditions than those appearing on the record of the mortgage.

In the case of Fire Ass'n of Philadelphia v. Flournoy, 84 Tex. 632, a notice of a lease was involved as to whether that notice should have put a party upon inquiry to ascertain the existence of another right or interest that the lessee had in the property. In that case the court said:

"* * * The fact that the appellant was informed of the existence of the lease would not put it upon inquiry to ascertain the existence of another right or interest that the lessees may have in the property. The only effect of this information would be to put appellant upon notice of the existence of the lease and of all the terms and conditions necessary and usually contained in instruments creating such estates. He would not be expected to examine such an instrument to ascertain if it passed a fee-simple or conditional title to the property described. Where the party states and names the right under which he holds, such information will not excite inquiry as to any other or different right. Dickey v. Henarie (Ore.) 15 P. 464."

In the case of Dewyer v. Dover (Ala.) 133 So. 581, it was said:

"A purchaser is charged with notice of that which appears on the face of conveyances in the chain of his title, but not bound to inquire into collateral circumstances."

In the case of C. & E. I. R. R. Co. v. Wright, 153 Ill. 307, it was said:

"It is difficult to lay down a general rule as to what facts are sufficient to charge a party with notice or put him upon inquiry. It is safe to say, however, that if the information received is of that character that it would arouse the suspicions of an ordinarily prudent person, and suggest to him a source of information which, by the exercise of ordinary and reasonable diligence, would, upon inquiry and investigation, lead him to the fact that a prior conveyance had been made, then he will be deemed chargeable with knowledge of such conveyance."

In the case at bar there was no information available to arouse Loyd's suspicion that Scott was claiming any interest in the fee in 18 inches of lot 31.

In the case of Bates et al. v. Gillett et al., 132 Ill. 287, the Supreme Court of Illinois held, as reflected in the 10th paragraph of the syllabus, as follows:

"A party, on learning that another was negotiating with his sons for the purchase of lands which they derived through their grandfather's will, wrote a letter to the proposed purchaser, notifying him that the will under which his sons claimed title was invalid, and that he had acquired a certain designated interest in the lands by the laws of descent, basing his claim on the invalidity of the will alone. On examination, the will was found to be valid, and thereupon the purchase was made; held, that the purchaser was not bound, on such notice, to examine any further than in respect to the validity of the will and matters appearing upon the records."

These cases hold, as I construe them, that a purchaser is not charged with constructive notice of anything which does not fall within the line or chain of his title. In the case of Bates v. Gillett, supra, it was specifically held that the purchaser was not required to examine any further than in respect to that notice which assaulted his title. If that is true and correct, it was not incumbent upon Loyd, the purchaser, to ascertain or even search further to ascertain from the owner of the lot 31, his grantor, as to whether or not his grantor had conveyed the land under the wall to any one other than himself. It would be entirely inconsistent with reason to require Loyd to ascertain from his grantor whether his grantor had made a conveyance of the land under the wall when his grantor had specifically made him a warranty deed to the entire lot 31 with the exception of said party wall. As I view this record, there was not the least suspicion to arouse in the mind of Loyd that his title thereto was not full and complete save and except the interest in the wall; and that interest in the wall does not mean a fee-simple title in the soil. In this connection it is interesting to note the case of Leonard v. White, 7 Mass. 6. In that case the Supreme Court of Massachusetts held as follows:

"By a grant of a grist mill with the appurtenances thereon, the soil of a way, immemorially used for the purpose of access to the mill from the highway, does not pass."

In the case at bar the defendant in error always recognized the right of the owner of lot 30 to tie into the wall in question. This right of easement was never questioned by her or her grantor. It cannot be contended that this right of easement was ever adverse, open, or notorious as against the right of said defendant in error. Mrs. Soderberg acceded in this right of easement and paid taxes upon the entire lot 31, including the 18-inch strip in question, she and her grantor, from the year 1902 until

about the year 1921, or for a period of approximately 19 years. This is a most striking circumstance. Surely one who claims a fee-simple title usually supports that claim by the payment of taxes. If Scott and his grantees were claiming title to said 18-inch strip in question, it only seems rational that they would have manifested enough interest in the maintaining of their title to pay the taxes, ad valorem and special improvements, in the front and rear of said lots, during the years from 1902 to 1921, covering the 18-inch strip. Surely they never manifested any interest at any time or place in that 18-inch strip, except a right of easement, and Scott knew that when he failed to record his deed to the 18-inch strip he could not claim title to the same as against Loyd, and knowing that to be the fact, he never exercised any rights over the same except the right of an easement which commenced in the year 1909 or 1911, and knowing that fact he could not make a conveyance of title to something which he did not have and which he could not assert. Loyd, by reason of his exception in the deed, recognized Scott's right to make use of the wall and the right to make use of the intervening strip to enjoy the use of the wall. That was a permissive use, and in no sense could be said to be open, hostile, and adverse to the rights of Loyd and Mrs. Loyd.

The evidence of the defendant, Mrs. Soderberg, states that she had paid the ad valorem taxes, front paving taxes and alley paving taxes on all of lot 31, until the year 1921, when the bank commenced paying the taxes on the 18 inch strip; that she never questioned the right of the owner of lot 30 to use the wall; never heard of any contention that any one was claiming any part of the lot 31 until about the year 1921 or 1922; that after the building was destroyed by fire in the early part of 1921, and a new building erected, the old wall was repaired, at which time she paid all the expenses of repairing the wall. On page 73 she testified that she never had disputed the right of the owner of lot 30 to use that wall between lots 30 and 31 since she had owned it; that she never knew of any contentions about any one claiming an interest in the 18 inches until she found out that Mr. Fowler of the bank was paying the taxes on the 18 inches.

Mrs. Soderberg always recognized the right of the owner of lot 31 to tie into the wall, and therefore recognized the right and permissive license or privilege of the owner of lot 30 to use such intervening strip on lot 31, as might be necessary to support the building on lot 30. In other words, the portion of the intervening strip was recognized by Mrs. Soderberg as necessary for the purpose of lot 30 to tie into said wall so long as the wall stood for the purpose for which it was received by Loyd as shown by the exception in his deed, to wit, the right of lot 30 to use said wall as a party wall. Of course, when the purpose of said wall should cease as a party wall, the land on which the wall stood would remit to the owner of lot 31. The right to use the party wall was only an easement and did not partake of the soil or fee-simple title. Under the statute it is only an easement or a servitude on lot 31. The use of said wall was never openly and notoriously adverse and hostile to the claim of Mrs. Soderberg. It was, as to her and her grantor, at all times, a permissive and not an adverse use.

The rule seems to be that in cases where adjoining owners have a wall on their respective property standing equally on the land of both, they are not owners in common of the wall, but each owns in severalty so much of the wall as stands on his own land subject to the easement or servitude in favor of the other to have the wall maintained as a party wall (American and English Cyclopedia of Law, vol. 22, page 239); and where the wall is entirely built on the lot of one of the adjoining owners, such wall may acquire the character of a party wall, and in such case the right of an adjoining owner depends exclusively on the right of the grant, and the adjoining owner does not acquire an interest in the fee title in the land upon which the wall stands. For the property of the wall itself necessarily "ensues the property of the land on which it stands" (Matts v. Hawkins, 5 Taunt. [1813] 20); and when the purposes of the wall have been closed and the wall pulled down, the soil of the owner of the land on which the wall stands will be remitted to the original owner of the land without any easement therein by the adjoining owner. In other words, under the instant case, the parties had the right to use the wall in question, but the wall stood exclusively on lot 31, and this soil under the wall having been acquired by Loyd without notice, by reason of an unrecorded deed from Williams to Scott, of any claim of Scott in fee under said wall, and said wall standing exclusively upon the ground of said Loyd, said Scott or his grantees acquired no title in said ground, but only the right to use the wall.

The wall ensued the nature of the tenure of the land. The tenure of the land was wholly in Loyd. There was no conveyance of this soil and no transfer of the property, and Loyd stands as the owner of the respective land under the wall. The owner of lot 30 is entitled to an easement in the wall standing on the lot of Loyd. Had the wall been completely destroyed by the fire in 1921, the easement would have ceased, and the soil under the wall remitted to Loyd.

In conclusion, if Scott never obtained title to the 18-inch strip as against Loyd, then when Scott made his deed to Foreman, in 1921, Foreman could obtain no better title than possessed by Scott. Scott never paid, for a single day, one cent of ad valorem taxes on the 18-inch strip, and no special improvement taxes, though street and alley assessments were levied against said lot 31 and were paid for by Loyd and Mrs. Soderberg, until the bank, having acquired all the interests of Scott in said lot in 1923, began paying the taxes. There is no merit to the adverse possession contention.

This is an equitable action. The majority opinion quiets title in the bank to the 18-inch strip in question. The bank did not acquire its deed to lot 31 and the 18-inch strip until 1924. It was bound to know from the records that there was a defect in its title. For it was confronted with the deed of record from Williams to Loyd which showed a conveyance covering the entire lot 31 excepting therefrom an interest in the west wall on said lot conveyed to Scott, and it was also faced with the record that Loyd's deed was recorded prior to the deed from Williams to Scott conveying the 18-inch strip. To quiet title of the bank in the 18-inch strip, when Loyd and Mrs. Soderberg had paid the taxes thereon, general and special improvements, from 1902 to 1921, for a period of 19 years, exceeding a prescriptive period, is discordant to my views. When the bank was bound to know of its defect in the title, it was also charged with knowledge as to who paid the taxes. That search of the records would have revealed that Scott and his grantees had not paid these taxes, but that burden had been borne entirely by Loyd and Mrs. Soderberg from 1902 to 1921.

It is my theory that the judgment of the trial court should have been affirmed, and that the majority opinion is without support.

For these reasons, I dissent.

I am authorized to announce that Mr.

Justice GIBSON concurs in the views herein announced.